UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY ARNOLD MCGHEE, JR.

       Petitioner,                    Civil Action No. 10-cv-10737

     v.                           District Judge Stephen J. Murphy, III
                                      Magistrate Judge Laurie J. Michelson
BARRY DAVIS, Warden,

       Respondent.
_____/

## REPORT AND RECOMMENDATION TO DENY PETITION FOR
## WRIT OF HABEAS CORPUS

In 1998, authorities searched a house in Pontiac, Michigan owned by Petitioner Larry McGhee. The search uncovered a large quantity of narcotics. McGhee, however, had rented out the property not long before the search and was not present when authorities arrived. McGhee was arrested in Georgia more than two years after the raid. In 2004, McGhee was tried and convicted for possession with intent to deliver 650 grams or more of cocaine, less than 50 grams of heroin, and less than 5 kilograms of marijuana. *See* Mich. Comp. Laws §§ 333.7401(2)(a)(i), (2)(a)(iv), (2)(d)(iii). The trial court sentenced McGhee to three months imprisonment on the marijuana conviction and consecutive terms of 12 months to 20 years on the heroin conviction and 20 to 30 years on the cocaine conviction.

McGhee now seeks habeas relief from this Court. For the reasons set forth below, this Court RECOMMENDS that his Petition for a Writ of Habeas Corpus be DENIED.

# I. BACKGROUND

## A. Petitioner's 1998 Trial

### 1. The September 1998 Search of Petitioner's Property

In 1997, Petitioner became the co-owner of a house at 483 Montana Street in Pontiac, Michigan. (Trial Transcript Volume ("Tr.") III at 203.) On September 14, 1998, members from the Oakland County Narcotics Enforcement Team executed a search warrant on that property. (Tr. II at 91.) When the authorities entered the house, no one was there. (Tr. II at 91.) In the kitchen, however, the team found a digital scale with residue of a substance later identified as cocaine. (Tr. II at 92.) In a "well disguised" compartment in the bathroom, they found two "baggies" collectively containing two pounds of marijuana. (Tr. II at 111, 113.) In the same compartment was an empty "Highpoint Arms" gun box. (Tr. II at 111-12.) Sitting in the middle of the bathroom floor, authorities found a green, wooden box containing 375 grams of cocaine, a knee brace, and, at the bottom, a 1991 fishing license issued to Petitioner. (Tr. II at 155-58; *see also* Tr. II 120.) In the hall closet, the team found a green "suit coat"-type jacket with approximately 28 grams of cocaine and under 50 grams of heroin. (Tr. II at 161, 175-176.) Also in the closet was what a team member believed to be a drug ledger or tally sheet. (Tr. II at 106.)

In a detached garage, the team found a locked, 1981 Grand Prix. (Tr. II at 159-161; Tr. III at 43-48.) The Grand Prix's trunk was "punched," suggesting that someone had, at some unknown time, broken into the trunk of the car. (Tr. III at 49-50.) The car's Vehicle Identification Number had been tampered with and the standard bench-style backseat had been replaced with a pair of bucket seats and console. (Tr. III at 44, 45-46, 48.) In that rear console, were two 125 gram packages of cocaine. (Tr. II at 159-160; Tr. III at 44, 45-46, 48.) Documents recovered in the

garage and car indicated that Petitioner purchased the vehicle in 1989 and had maintained insurance and registration for the vehicle through mid-to-late 1996. (Tr. II at 169, 194.)

Documents addressed or belonging to Petitioner were found in various places in Petitioner's house. Most of the documents were old relative to the 1998 search. For example, inside the Grand Prix was Petitioner's 1989 application for a driver's license. (Tr. II at 163-64.) Similarly, authorities recovered a 1992 name tag for "Larry Crunch McGhee." (Tr. II at 168.)[1] However, the raid team also found some relatively recent documents. In the garage, they recovered an October 1997 document from a towing company which included Petitioner's name and referenced the Grand Prix. (Tr. II at 168.) In the hall closet, the team found a utility bill in Petitioner's name with a billing period of August 4 to September 2, 1998, and a due date of September 24, 1998. (Tr. II at 96-98.) On the kitchen table, authorities recovered a "form from the Michigan Department of Consumer and Industry Service Corporation, Securities and Land Development Bureau." (Tr. II at 181.) As one of the raid team members explained to the jury:

> And on top of that form is a note. It looks like . . . [Mr. McGhee] [was] trying to form a business. This [form?] is dated [August 17, 1998.]
>
> And there's a note on this . . . yellow pad – the date of 9-10, 6:00 p.m. It said, "Crunch, you can have a copy of the form, since I had to come to the west side for another appointment. It ain't my fault. Good luck. Sincerely" – and I can only – it looks like maybe "Nichols" or "Eckles."

(Tr. II at 181.)

---

[1]Evidence at trial showed that Petitioner's nickname was "Crunch." (*See* Tr. II at 174 (deputy reciting documents found in the garage: "Crunch Time Real Estate and Business Consultant, which is – are business cards, we assume, from Mr. McGhee, being that that's his nickname. Crunch Business Consulting, Larry McGhee, Jr. This is from when he was at college . . . because its got his college address on it."); *see also* Tr. III at 60.)

Although Petitioner owned the 483 Montana property, for about a year prior to the raid, Petitioner had rented the property to one Michael Butler. Butler testified that Petitioner had left "[c]lothes, documents, [and] some miscellaneous paperwork" in the garage and hallway closet. (Tr. II at 217, 224.) Petitioner's Grand Prix was also in the garage while Butler rented the property. (Tr. II at 215.) Butler said he did not have access or keys to the car and that "as far as [he knew]" it was locked. (Tr. II at 215.) Butler noted that "personal correspondence" for the Petitioner would occasionally come to the property while he was a tenant. (Tr. II at 223.)

Butler acknowledged that Petitioner asked Butler to move out because he did not want Butler's brother, recently released from prison, living at the house. (Tr. II at 225.) Butler moved out sometime in or around August 1998; he testified that he locked up the residence and left the house keys inside. (Tr. II at 212, 226.) During the subsequent September 1998 raid, officers found some mail belonging to Butler, including a utility shutoff notice for the period August 4 to September 2, 1998. (Tr. II at 124, 180, 198.) Butler testified that he had utilities in his name while he lived at Petitioner's house but, when he moved out, he did not shut off the utilities and did not know who did. (Tr. II at 212.)

Marilyn Bender, whose home neighbored 483 Montana, testified that Butler moved out about a month prior to the September 1998 raid. (Tr. II at 239.) After Butler moved out, she saw cars at the house but never met the person living or using the house. (Tr. II at 240, 242.) At trial, she stated that she had never seen Petitioner before and never saw him going to the house after Butler moved out. (Tr. II at 242.) She conceded, however, that she had no idea who used the home after Butler. (Tr. II at 242.)

More than two years after the 1998 raid, Petitioner was apprehended. (Tr. III at 160.) In

January 2001, FBI agents found Petitioner in Georgia, and, after Petitioner did not answer the door, used an entry tool to gain access to the apartment. (Tr. III at 160-61.) Petitioner then showed the agents a Georgia driver's license containing his picture and a false name: Adante Kraft. (Tr. III at 162, 164.) According to one of the FBI agents, Petitioner responded that the drug possession charges were hearsay. (Tr. III at 162.) The agents found a .45-caliber handgun in the glove box of Petitioner's car. (Tr. III at 177.)

### 2. The 1992 Raid of 483 Montana

Six years before the events at issue in this case, 483 Montana was subjected to another raid. Three former Pontiac police officers involved in the 1992 raid testified at Petitioner's trial. Loren Brown testified that four adults and a child were present during the raid but that he would no longer recognize any of the individuals if he saw them. (Tr. II at 70.) Brown further stated that during the raid he went into one of the bedrooms and, in the closet, found a green, "male-sized" jacket with "two plastic baggies containing crack cocaine." (Tr. II at 70.) Another officer, James Webb, testified that he arrested an individual who identified himself as Larry McGhee. (Tr. II at 75-76.) However, Webb also testified that while Petitioner "look[ed] familiar," he did not recognize him. (Tr. II at 75, 80.) The individual Webb arrested denied selling drugs but told Webb that all the cocaine and marijuana found at the house belonged to him. (Tr. II at 75-76.) Webb estimated that the cocaine found during the 1992 raid was worth about $5,000, which, according to Webb, was not consistent with personal use. (Tr. II at 76.) The third 1992 raiding officer, Daniel Casey, told the jury that he found a suitcase containing about $1,200 of cocaine on top of a refrigerator in the garage and that there was also a small amount of marijuana in the garage. (Tr. II at 148.) He could not remember if Petitioner was (or was not) at the house during the raid. (Tr. II at 149.)

Petitioner opposed the admission of this other-act evidence. He also sought to introduce evidence that the search warrant for the 1992 raid was invalid (procured using false information), that the associated criminal charges were dismissed, and that he received a monetary settlement in a subsequent civil suit against the City of Pontiac – including Webb – arising out of the search. (Tr. I at 9-11; *see also* Dkt. 14-34 at Pg ID 2980.) The trial court did not admit this evidence.

### 3. Testimony Regarding Petitioner's 1995 Drug Sales

The prosecution also introduced other-act evidence from 1995. In particular, Lamark Northern testified that Petitioner had twice sold him drugs in 1995. (Tr. III at 57-58.) Neither sale took place at 483 Montana, however. (Tr. III at 126.) One sale involved a quarter-ounce of cocaine and the other one-ounce. (Tr. III at 58.) Northern also said that he participated in a large drug buy (for 10 kilograms of cocaine). According to Northern, another buyer mentioned that the cocaine was going to be divided among several people, including "Crunch." (Tr. III at 60-63.) Northern also testified, over hearsay objections, that one Demar Garvin told him that, in 1995, Garvin had a conversation with Petitioner where "Crunch was upset . . . because [one Nathaniel Lee] was charging [Crunch] more per kilo than what [Lee] paid for them. . . . [Crunch] was upset because at times when he had purchased cocaine for [Lee] . . . he didn't put any extra charge on it." (Tr. III at 64-65.)

Northern admitted that he agreed to testify against Petitioner in grand jury proceedings in hopes of shortening his own sentence for possession with intent to distribute cocaine. (*See* Tr. III at 52-54, 76, 127.) On cross, Petitioner's counsel brought out the fact that Northern's sentence was reduced from 22 to six years for his testimony. (Tr. II at 100, 127.) Moreover, when the prosecutor asked Northern if he would lie under oath if the Oakland County Prosecutor's Office asked him to

do so, he responded: "Yes, I would." (Tr. III at 131.) Northern was also impeached with arguably inconsistent testimony at federal and state grand jury proceedings. (Tr. III at 149-51.) Before the federal grand jury, Northern omitted Petitioner while identifying others involved in the large drug buy; but when Northern testified before the state grand jury, he implicated Petitioner in the buy. (Tr. III at 149-51.)

### B. Procedural History

On May 28, 2004, after about six hours of deliberation, including a point at which the jury indicated they could not reach a verdict, the jury convicted Petitioner of possession with intent to distribute cocaine, heroin, and marijuana. The trial court sentenced Petitioner on July 1, 2004. (*See* Dkt. 14-1, Oakland County Docket Summary.)

On or around October 18, 2004, Petitioner, through new counsel, moved for a new trial on the bases of ineffective assistance of counsel and prosecutorial misconduct. (*See* Dkt. 14-18, Mot. for New Trial.) On December 8, 2004, the trial court denied the motion and noted that Petitioner's trial counsel "did a very good job." (Dkts. 14-15 to 14-17.)[2]

On December 10, 2004, Petitioner filed a motion to remand with the Michigan Court of Appeals. (Dkt. 14-28 at ECF Pg ID 2332-73.) Similar to the motion for new trial, the remand motion raised ineffective assistance of trial counsel and prosecutorial misconduct claims. (Dkt. 14-28 at ECF Pg ID 2341.) The Michigan Court of Appeals denied the motion on January 27, 2005 "for failure to persuade the Court of the necessity of a remand at this time." (Dkt. 14-28 at ECF Pg ID

---

[2]In deciding this post-trial motion, the trial court mentioned that the jury had told the court that when they reviewed the drug ledger recovered from 483 Montana during their deliberations, they saw Petitioner's daughter's name in the ledger; according to the trial court, "[t]hat's why the defendant was found guilty." (Dkt. 14-15 at 18-20.)

2328.)

On or around February 7, 2005, Petitioner filed his appellate brief, and on November 8, 2005 the Michigan Court of Appeals issued a lengthy published opinion denying Petitioner's appeal. *People v. McGhee*, 709 N.W.2d 595 (Mich. Ct. App. 2005).

On November 26, 2008, the Michigan Supreme Court denied leave to appeal "because [it was] not persuaded that the questions presented should be reviewed." *People v. McGhee*, 483 Mich. 1073, 769 N.W.2d 598 (Mich. 2008). It does not appear that Petitioner sought certiorari from the United States Supreme Court or state post-conviction relief.

On February 22, 2010, Petitioner filed a habeas corpus petition with this Court. (Dkt. 1.)

## II. PETITIONER'S CLAIMS

Petitioner raises the following claims for habeas relief:

> I(A). APPELLANT WAS DENIED DUE PROCESS OF LAW AND THE RIGHT TO A PROPERLY INSTRUCTED JURY BY THE REFUSAL OF THE TRIAL COURT TO GIVE A NECESSARILY INCLUDED LESSER OFFENSE INSTRUCTION CONTRARY TO ESTABLISHED FEDERAL PRECEDENT AS WELL AS THE FAILURE TO GIVE AN ACCOMPLICE INSTRUCTION IN CLEAR CONTRADICTION OF *HOPKINS V REEVES*, 524 U.S. 88 AND PROGENY.

> I(B). THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON ACCOMPLICE TESTIMONY BUT ONLY INSTRUCTED THEM ON INFORMANT TESTIMONY IN REGARDS TO THE TESTIMONY OF LAMARK NORTHERN.

> II. THE COURT OF APPEALS CLEARLY ERRED IN HOLDING THAT THE ADMISSION OF ILLEGALLY SEIZED EVIDENCE AS A 404(b) ACT WAS NONCONSTITUTIONAL ERROR RATHER THAN CONSTITUTIONAL ERROR, AND THAT THEREFORE DEFENDANT HAD THE BURDEN OF SHOWING THAT IT WAS MORE PROBABLE THAN NOT THAT THE ADMISSION AFFECTED THE OUTCOME OF THE TRIAL.

III. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN SEVERAL KEY, PREJUDICIAL, AND OUTCOME DETERMINATIVE WAYS, INCLUDING:

a. Trial Counsel failed to properly investigate, discover, and offer evidence regarding bias of the officers who testified regarding the improper 1992 prior bad acts evidence, including crucial evidence that the officers named a completely different suspect as the target of the search warrant at issue.

b. Trial Counsel failed to object to a firearm found in Petitioner's vehicle as prior/other bad acts evidence when Petitioner was arrested inside of his residence, and in fact improperly brought out the evidence related to the firearm, improperly argued regarding the firearm, and failed to object to the empty firearm boxes admitted as evidence.

c. Trial Counsel failed to argue that the prior bad acts of 1992 could not be used in the prosecutor's case in chief, failed to attempt to exclude Petitioner's 1992 statements obtained in violation of Petitioner's constitutional rights, and failure to allege *Miranda* violations regarding the 1992 statements.

d. Counsel implied that his client had gotten away with a crime in 1992.

e. Counsel failed to object to prosecutorial misconduct.

f. Counsel failed to move to dismiss the case based on the decision in *People v. Glass*, 464 Mich 266 (2001).

IV. PETITIONER WAS DENIED DUE PROCESS OF LAW DUE TO PROSECUTORIAL MISCONDUCT IN THE FOLLOWING WAYS:

a. Prosecutorial vouching for the veracity and credibility of key prosecution witnesses.

b. The prosecutor intentionally and improperly raised the issue of Petitioner's invocation of his Fifth Amendment right to remain silent, shifting the Burden of proof on to Petitioner.

c. Intentional Prosecutorial presentation of prior bad acts

evidence as substantive evidence of Petitioner's guilt.

d. Intentional prosecutorial invocation of the Jury to convict due to the Jury's civic duty.

**V. PETITIONER WAS DENIED DUE PROCESS OF LAW AND AN OPPORTUNITY FOR A FAIR TRIAL WHEN THE TRIAL COURT IMPROPERLY ALLOWED THE PROSECUTION TO OFFER PRIOR BAD ACTS EVIDENCE FROM 1992 AS "PROPENSITY EVIDENCE."**

**VI. DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN INSUFFICIENT EVIDENCE WAS PRESENTED TO PROVE BEYOND A REASONABLE DOUBT THAT A NECESSARY COMPONENT OF THE OFFENSE EXISTED, I.E. DOMINION OR CONTROL OF THE CONTRABAND AT ISSUE.**

**VII. DEFENDANT WAS DENIED DUE PROCESS BY A PLETHORA OF EVIDENTIARY ERRORS COMMITTED BY THE TRIAL COURT, INCLUDING:**

a. Preventing Petitioner from presenting evidence that the 1992 case relied on by the prosecutor as substantive evidence was dismissed, police acted illegally, and that Petitioner was successful in a civil suit against the officers in question.

b. Allowing the officers to testify regarding the number of raid teams executing warrants on the day of the incident.

c. Permitting Lamark Northern to testify to statements of what others had told him concerning Petitioner's drug activities.

d. Limiting Petitioner's right to cross examination regarding Northern's agreement for leniency in exchange for his testimony.

**VIII. THE COURT OF APPEALS CLEARLY ERRED IN REVERSING THE LOWER COURT'S DECISION QUASHING THE SEARCH WARRANT AND APPELLANT WAS DENIED HIS RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES IN THE FOLLOWING WAYS:**

a. Where the garage was not particularly described in the

search warrant, it is a violation of the Fourth Amendment for the police officers to have searched it.

b. The affidavit in support of the warrant failed to establish probable cause as to 483 Montana and the information given was stale.

(Dkt. 7, Am. Pet. for Habeas.)

## III. ANALYSIS

### A. Standard of Review

Petitioner's Application was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). His habeas petition is therefore governed by the AEDPA's provisions. The Act amended the substantive standards for granting habeas relief by providing:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A decision is also

contrary to federal law where the "state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 406.

A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 407-08). As the Supreme Court has recently emphasized, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 785 (2011) (quoting *Williams*, 529 U.S. at 410). Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Moreover, in determining whether the state court unreasonably applied a rule, a federal habeas court must consider the rule's specificity: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664).

## B. Claim II:[3] The Michigan Court of Appeals' Conclusion that the Admission of the 1992 Raid Evidence Was Not Constitutional Error Was Not an Unreasonable Application of, or Contrary To, Supreme Court Precedent

In Claim II, Petitioner challenges the Michigan Court of Appeal's conclusion that the admission of the 1992 raid evidence was nonconstitutional error. The Michigan Court of Appeals agreed with Petitioner that the trial court erred in admitting the 1992 raid evidence because (1) the evidence was obtained via an unconstitutional search and seizure, (2) the officers who testified at

_____

[3]For ease of analysis, the Court addresses Petitioner's claims in a different order from that presented in Petitioner's Application.

Petitioner's trial about the 1992 raid were those involved in the raid, and (3) Petitioner's trial, although many years later and for a different wrong, remained within those "officer's primary zone of interest" such that the exclusion of evidence would still provide adequate police deterrence. *McGhee*, 709 N.W.2d at 608-10.  But the Appellate Court concluded that the admission of the 1992 raid evidence "was nonconstitutional in nature."  It followed, said the Michigan Court of Appeals, that the 1992 raid evidence was harmless if it did not more-probably-than-not affect the outcome of Petitioner's trial.  *Id.*  But, says Petitioner, had the Michigan Court of Appeals found the error constitutional in nature, the prosecution would have had the burden of showing that the admission of the 1992 raid evidence was harmless beyond a reasonable doubt.

Petitioner cites no U.S. Supreme Court precedent holding that the admission of evidence obtained via an illegal search and seizure is itself a violation of the Fourth Amendment.  He claims that "[i]t is hard to fathom how the admission of evidence obtained by deceitful and deliberate police misconduct in fabricating an affidavit for a search warrant could not be considered Constitutional error." (Dkt. 7, Am. Pet. for Habeas at 18.)  He also asserts that "[t]here is no doubt that allowing the prosecution to use evidence illegally obtained in a 1992 search premised on a fabricated search warrant affidavit invoked Petitioner's U.S. Constitution, Fourth Amendment Right against unreasonable searches and seizures." (*Id.* at 19.)

But the Supreme Court precedent reviewed by this Court suggests that the Michigan Court of Appeals' conclusion of nonconstitutional error was not an unreasonable application of, or contrary to Supreme Court case law.  In *United States v. Leon*, the Supreme Court provided:

> The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "work[s] no new Fourth

13

> Amendment wrong." The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered."

468 U.S. 897, 906 (1984) (internal citations omitted). And, just last year, the Supreme Court reiterated:

> The [Fourth] Amendment says nothing about suppressing evidence obtained in violation of this command. That rule – the exclusionary rule – is a "prudential" doctrine, created by this Court to "compel respect for the constitutional guaranty." Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. . . .
>
> Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. "Expansive dicta" in several decisions, suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. . . . In time, however, we came to acknowledge the exclusionary rule for what it undoubtedly is – a "judicially created remedy" of this Court's own making.

*Davis v. U.S.*, — U.S. —, 131 S.Ct. 2419, 2426-27 (2011) (internal citations omitted). Accordingly, this Court finds no error warranting habeas relief in the Michigan Court of Appeals conclusion that "[a]lthough the 1992 search and seizure violated defendant's rights, the admission of the evidence obtained did not amount to a constitutional violation." *McGhee*, 709 N.W.2d at 611.

Petitioner attempts to avoid this result by arguing that because his statements to authorities in 1992 were made in violation of the *Fifth* Amendment, at least their admission at trial amounted to constitutional error. In particular, Petitioner asserts that he was not advised of his *Miranda* rights during the 1992 raid and that authorities coerced his inculpatory statement regarding ownership of the drugs they found. (Am. Pet. for Habeas at 33; *see also id.* at 17 & n.1; Dkt. 14-36 at Pg ID 3077.)

Before turning to the merits of this claim, the Court must first revisit the standard of review. In concluding that the admission of the 1992 raid evidence was nonconstitutional error, the Michigan Court of Appeals did not consider the alternative Fifth Amendment argument. Petitioner did not assert a *Miranda* violation or coercion during trial, nor did he then move for a "*Walker* hearing"[4] regarding the circumstances surrounding the 1992 statements. And even before the Michigan Court of Appeals, he only briefly mentioned it within the context of a larger Fourth Amendment argument. (Dkt. 14-28 at ECF Pg ID 2420 (internal citations omitted).) As a result, the argument remains unaddressed.

In *Harrington v. Richter*, the Supreme Court held that

> where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.

— U.S. —, 131 S. Ct. 770, 784 (2011). But this case is unlike *Harrington* in that the Michigan Court of Appeals did not deny the whole of Petitioner's appeal in a one sentence summary order. Nor is this a case where the Appellate Court provided analysis of some claims with a catch-all that unaddressed claims were denied as being without merit. Rather, the Michigan Court of Appeals addressed, when including subparts, over 20 claims of error raised by Petitioner. Further, given that

---

[4]*People v. Walker*, 374 Mich. 331, 132 N.W.2d 87 (Mich. 1965); *see also Harvey v. Jones*, No. 1:04-cv-35, 2008 WL 3539477, at *10 (W.D. Mich. Aug. 8, 2008) ("In Michigan, *Walker* hearings are held to determine *Miranda* violations as well as the voluntariness of a confession, even though *Walker* itself dealt only with the confession's voluntariness and was decided by the Michigan Supreme Court before the United States Supreme Court decided the *Miranda* case. The prevailing practice that has developed in Michigan courts has been to denominate all hearings challenging the constitutional validity of confessions – whether based on *Miranda* violations or voluntariness – as '*Walker* hearings.'").

the *Miranda* claim was not raised at trial or as a stand-alone claim in the state-court motion to

remand, had the Michigan Court of Appeals in fact considered it, it is likely that it would have found

it defaulted. The totality of the circumstances, therefore, leads this Court to conclude that the

Michigan Court of Appeals did not "adjudicate[]" Petitioner's *Miranda* claim "on the merits." *See*

*Harrington*, 131 S. Ct. at 784-85 ("When a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state court adjudicated the claim on the

merits *in the absence of any indication* or state-law procedural principles to the contrary." (emphasis

added)). Accordingly, *de novo* review is appropriate. *See Lyell v. Renico*, 470 F.3d 1177, 1182 (6th

Cir. 2006); *Valladolid v. Sherry*, No. 2:08-cv-62, 2011 WL 4352772, at *3 (W.D. Mich. Sept. 16,

2011).

Regarding the merits of Petitioner's claim, the Court does not quarrel with Petitioner's

assertion that the admission of statements taken in violation of *Miranda*'s safeguards is

constitutional in nature:

> As we explained in [*Stone v. Powell*, 428 U.S. 465 (1976)], [the
> exclusionary rule [associated with the Fourth Amendment], held
> applicable to the States in *Mapp v. Ohio*, 367 U.S. 643 (1961)] "is not
> a personal constitutional right," but serves to deter future
> constitutional violations . . . . Nor can the *Mapp* rule be thought to
> enhance the soundness of the criminal process by improving the
> reliability of evidence introduced at trial. . . . *Miranda* differs from
> *Mapp* in both respects. "Prophylactic" though it may be, in
> protecting a defendant's Fifth Amendment privilege against
> self-incrimination, *Miranda* safeguards "a fundamental *trial* right."

*Withrow v. Williams*, 507 U.S. 680, 691 (1993); *see also Dickerson v. U.S.*, 530 U.S. 428, 444

(2000) (holding that *Miranda* was "a constitutional decision of this Court" that could not be

overruled by an Act of Congress); *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010) (applying

the "substantial and injurious effect" harmless-error standard for constitutional errors upon finding

that some of the petitioner's statements were obtained in violation of *Miranda*).

But the Court does find the factual basis for Petitioner's Fifth Amendment claims deficient.

Sergeant Webb's testimony directly contradicts Petitioner's assertion that he was not advised of his

*Miranda* rights by the officers involved in the 1992 raid:

> [PROSECUTOR:] Did you have a conversation on that day with somebody who identified himself to you as Larry McGhee?
> [WEBB:] Yes, I did.
> Q. Okay. And when you had a conversation with that person, was he under arrest?
> A. Yes, he was.
> Q. And prior to speaking with him, did you advise him of his Miranda rights?
> A. Yes, I did.
> Q. Okay. And did he indicate to you that he understood those rights?
> A. Yes.
> Q. And did he indicate to you that he would waive those rights?
> A. Yes.

(Tr. II at 75-76.)[5] In rebuttal, Petitioner offers an affidavit which provides:

> 1. That he [Larry McGhee] is the defendant in the above captioned case;
> 2. That in 1992, he was at 483 Montana when the police entered his home with guns drawn;
> 3. That while the guns were still displayed, an officer questioned him about the presence of drugs at his home;
> 4. Pursuant to these questions, he made admissions;
> 5. That before the admissions were made, he was not advised of his *Miranda* rights;
> 6. That he never gave up those rights;
> 7. [Sergeant] Webb testified to those statements at the trial in the

---

[5]Petitioner asserts that Webb had reason to be biased because he was the subject of a civil suit arising out of the 1992 raid from which Petitioner obtained a settlement. But Webb's testimony indicates no bias: Webb appeared to be testifying from memory refreshed from a police report prepared prior to the civil suit, he could not recall having to recount Petitioner's statements at any earlier trial, and could not even remember if the individual he arrested in 1992 looked like Petitioner: "It's been 12 years. I – I don't recognize him. He looks familiar. That's all I can tell you." (Tr. II at 79-81.)

instant case;
8. He answered the questions only of fear for his safety and the safety of others[.]

(Dkt. 14-36 at Pg ID 3077.)

There is reason, however, to discount this affidavit. In denying Petitioner's claim that trial counsel was ineffective when he failed to raise the *Miranda* issue at trial, the Michigan Court of Appeals concluded that counsel could not have been ineffective in this regard because "there is no indication in the record" that Petitioner made it known to counsel that his 1992 statements were taken in violation of *Miranda*. *McGhee*, 709 N.W.2d at 614. Petitioner has not challenged this fact-based conclusion in his application for habeas and it is owed great deference under the AEDPA. *See* 28 U.S.C. § 2254(e)(1). Therefore, the Court can only reasonably conclude that Petitioner first averred that his *Miranda* rights had been violated after he was convicted and sentenced.

Additionally, a police report prepared by another officer just two days after the raid corroborates Webb's testimony:

> See [Sergeant] J. Webb supp. [supplement?] he prepared, that will include the Resp. statement where he admitted that all the [c]ocaine and marijuana found did belong to him. This writer also witnessed [Sergeant] Webb advising [R]esp. of his [r]ights under the *Miranda* [w]arning, also the [R]esp. making the statement.

(Dkt. 14-26 at Pg ID 2146; *see also* Dkt. 14-28 at Pg ID 2385 (State's Response to Defendant's Motion to Remand); Dkt. 14-28 at Pg ID 2499 (State's Response Brief on Appeal).)

Given Sergeant Webb's testimony (based on recollection refreshed from his 1992 police report), a corroborating police report, and Petitioner's *post hoc* contrary affidavit, this Court cannot conclude that Petitioner was not given his *Miranda* warnings. *See Williams v. Allen*, 598 F.3d 778, 788 (11th Cir. 2010) ("It is the petitioner's burden to establish his right to habeas relief and he must

18

prove all facts necessary to show a constitutional violation.") (alteration and quotation marks omitted); *cf. Sones v. Bell*, No. 1:07-cv-552, 2010 WL 2472760, at \*12 (W.D. Mich. Apr. 26, 2010) *objections overruled by* 2010 WL 2472761 (W.D. Mich. June 14, 2010) (finding that "Petitioner has failed to demonstrate factual support for his claim that he was not read his *Miranda* rights" where Petitioner merely made the allegation but did not present any evidence on the issue to the state court and a detective "unequivocally testified at trial that he advised Petitioner of his rights and that Petitioner indicated that he understood those rights").

Regarding Petitioner's claim of coercion, "[a] habeas petitioner bears the burden of proving that a confession was involuntary." *Taylor v. Ludwick*, No. 2:08-CV-11823, 2009 WL 3462542, at \*8 (E.D. Mich. Oct. 22, 2009) (citing *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987)). Voluntariness need only be established by a preponderance of the evidence. *Boles*, 816 F.2d at 1136. The Sixth Circuit has established three requirements for finding a confession involuntary due to police coercion: "'(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). In making these determinations, a court must consider "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include: (1) police coercion, (2) the length of interrogation, (3) location of the interrogation, (4) continuity of interrogation, (5) the suspect's maturity, (6) the suspect's education, (7) the suspect's physical condition and mental health, and (8) whether the suspect was advised of his *Miranda* rights. *See Withrow v. Williams*, 507

U.S. 680, 693-94 (1993). Although all factors should be closely scrutinized, *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), without coercive police activity, a confession should not be deemed involuntary, *Colorado v. Connelly*, 479 U.S. 157, 165-57 (1986).

Given Petitioner's affidavit and the facts that this Court can divine from the record, Petitioner has not carried his burden in showing that his confession was involuntary. Petitioner's affidavit provides that in 1992, officers entered 483 Montana with their guns drawn, and "while the guns were still displayed, an officer questioned [Petitioner] about the presence of drugs at his home." (Dkt. 14-36 at Pg ID 3077.) Petitioner says he "answered the questions only of fear for his safety and the safety of others." (*Id.*) But absent from his affidavit is whether authorities used their drawn weapons in a manner to threaten Plaintiff as opposed to for safety or security purposes. *Cf. McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) (holding that defendant's statements were voluntary although made while in handcuffs and surrounded by yelling police officers who had their weapons drawn where officer testified that defendant was a dangerous, fleeing felon). And Petitioner does not assert lengthy or repetitive questioning, that the officer's questioning included any threatening language or tone, or that he suffered from a physical or mental condition that impaired his cognitive or volitional capacity. Moreover, at trial, Petitioner's counsel indicated that Petitioner has a college education and Petitioner was 22 years old at the time of the 1992 raid. Accordingly, Petitioner has not carried his burden of showing that his 1992 statements were involuntary.

Lastly, to the extent that Petitioner seeks an evidentiary hearing on the factual circumstances surrounding his 1992 statement to Webb, that request should be denied. The AEDPA provides,

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

> (A) the claim relies on–
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Diligence requires "in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.*

As mentioned, the Michigan Court of Appeals held that Petitioner did not raise the *Miranda* issue with his trial counsel. This denotes a lack of diligence, which, in turn, deprived the trial court the opportunity to hold a *Walker* hearing to develop the facts on this claim.

Additionally, Petitioner's state-court motion to remand did not seek a *Walker* hearing; rather, he sought a "*Ginther* hearing" regarding the effectiveness of trial counsel. (Dkt. 14-28 at ECF Pg ID 5-6, Motion to Remand.) The two types of requests are not equivalent because, as the Michigan Court of Appeals in fact concluded, counsel's conduct with regard to the *Miranda* claim may be deemed not ineffective without resolving the factual issue of whether Petitioner's Fifth Amendment rights were violated. And Petitioner's reliance on the two identical footnotes in his state-court brief in support of his motion to remand and his state-court appellate brief ("[s]ince there is no written [*Miranda*] waiver, a hearing would have to be held on this issue") is misplaced. As recently

explained by a court in this District in an analogous situation, a footnote in a brief is not the proper

means of seeking an evidentiary hearing in Michigan courts:

> It is true that petitioner did alternatively request remand for a hearing in addition to a new trial in the body of his pro per appellate brief. This request, however, was a single sentence seeking alternative relief at the conclusion of counsel's argument regarding the ineffective assistance claim. The Michigan Court Rules, however, require that such a request for an evidentiary hearing be made in a separate motion. *See* Mich. Ct. R. 7.211(C)(1). Petitioner's "alternative request in [his] appellate brief for a *Ginther* hearing is not a timely motion for remand as required by MCR 7.211(C)(1)." *People v. Fisher*, No. 262961, 2007 WL 283799, at *2 n. 2 (Mich. Ct. App. Feb. 1, 2007) (per curiam); *see also*, *People v. Carter*, No. 232862, 2003 WL 887594, at *4 (Mich. Ct. App. Mar. 6, 2003) (per curiam) . . . . Petitioner's seeking of this alternative relief in the body of his appellate brief was insufficient to constitute diligent pursuit of an evidentiary hearing under § 2254(e)(2), in light of Rule 7.211(C)(1) and the Michigan courts' interpretation of that rule.

*Mykolaitis v. Howes*, No. 2:10-CV-11903, 2011 WL 3624949, at *47 (E.D. Mich. 2011).

Accordingly, Petitioner did not act with the requisite due diligence in developing the factual

basis for his *Miranda*-based claims in state court. Moreover, 28 U.S.C. § 2254(e)(2)(A) is

inapplicable, and Petitioner has not carried his "clear and convincing" burden under 28 U.S.C.

§ 2254(e)(2)(B). Thus, an evidentiary hearing is not warranted.

In sum, Claim II of Petitioner's Application does not warrant habeas relief.

### C. Claim V: Petitioner's Assertion that the Trial Court Erroneously Admitted "Other Act" Evidence Does Not Warrant Habeas Relief

In Claim V, Petitioner asserts that the erroneous admission of (1) evidence regarding the

1992 raid of 483 Montana, (2) Northern's testimony about Petitioner's narcotics sales in 1995, and

(3) testimony about the .45-caliber gun recovered during Petitioner's arrest justify habeas relief.

(Am. Pet. for Habeas at 56-63.)

In furtherance of this Claim, Petitioner presents an extended argument as to why this "other act" evidence was not admissible under Mich. R. Evid. 404(b)(1) or, if admissible under that rule, why the evidence should have been excluded as unfairly prejudicial propensity evidence under Fed. R. Evid. or Mich. R. Evid. 403. (Am. Pet. for Habeas at 56-63.) But "in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67-68. Thus, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983).

Petitioner also appears to assert, however, that the admission of the other-act evidence deprived him of a fundamentally fair trial. (*See* Am. Pet. for Habeas at 52 (claiming violation of due process).) Although this due process claim is cognizable on collateral review, "[a]n evidentiary ruling may violate due process – and thus warrant habeas relief – only where it 'is so egregious that it results in a denial of fundamental fairness.'" *Hudson v. Lafler*, 421 F. App'x 619, 628 (6th Cir. 2011) (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)). And "the Supreme Court has defined 'very narrowly' the category of infractions that violate 'fundamental fairness.'" *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *see also Hudson*, 421 F. App'x at 628 ("Erroneously admitting evidence under state evidence rules amounts to a due process violation in a federal habeas proceeding only in extraordinary cases.").

Before turning fully to this claim, it is again helpful to revisit the standard of review. In

finding that the other-act evidence against Petitioner was properly admitted, the Michigan Court of

Appeals analyzed the issue under the Michigan Rules of Evidence. *See People v. McGhee*, 709

N.W.2d 595, 605-08 (Mich. Ct. App. 2005). It did not address the issue now before this Court:

whether the admission of the other-act evidence ran afoul of the Due Process Clause. *Id.* The

Michigan Court of Appeals did address, however, whether the trial court abused its discretion in

finding that the probative value of the other-act evidence was not substantially outweighed by the

unfair prejudice from its admission. *Id.* at 607-08. Accordingly, AEDPA deference, albeit

"modified," is still warranted:

> The Ohio Supreme Court conducted a prejudice inquiry and, in ruling
> that the trial court complied with Ohio R. Evid. 404(B), found that
> the [other-act] evidence's probative value outweighed any unfair
> prejudicial impact that it might also have had. . . . Because the Ohio
> Supreme Court's prejudice inquiry into [Petitioner's] state-law claim
> bears at least "some similarity" to a determination of his current due
> process claim, we review this claim under *Maldonado*'s modified
> AEDPA standard, which "requires [us] to conduct a careful review
> of the record and applicable law, but nonetheless bars [us] from
> reversing unless the state court's decision is contrary to or an
> unreasonable application of federal law [i.e., Supreme Court
> precedent]."

*Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007) (quoting *Maldonado v. Wilson*, 416 F.3d 470, 476

(6th Cir. 2005)). Moreover, as the Sixth Circuit explained in *Bey*, "because the [Michigan Court of

Appeal's] prejudice inquiry relied entirely on [Michigan] law without any reference to federal

law . . . [this Court] need not consider whether that decision resulted in an unreasonable application

of federal law. [It] need only look to the question of whether the [Michigan Court of Appeal's]

decision is contrary to federal law." *Id.*

Petitioner has not pointed to any Supreme Court precedent that the Michigan Court of

Appeal's decision regarding the other-act evidence could be contrary to. In fact, in *Bey v. Bagley*,

a case where the habeas petitioner, Gregory Bey, claimed that other-act evidence deprived him of a fundamentally fair trial, the Sixth Circuit explained,

> [W]e should note that Bey has not presented, nor have we discovered, any Supreme Court precedent indicating that a state court violates a criminal defendant's due process rights when it *properly* admits evidence of the defendant's other bad acts. We recognized as much in *Bugh v. Mitchell*, [329 F.3d 496 (6th Cir. 2003),] where we held that the state court's admission of "other acts" evidence was not contrary to clearly established Supreme Court precedent, inasmuch as "*[t]here is no* clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512 (emphasis added). Therefore, under this circuit's precedent, the Ohio Supreme Court's decision that admission of this evidence was proper – combined with our ordinary inability to reconsider a state court's state-law-based decisions – would appear to defeat Bey's claim.

500 F.3d 514, 520 (6th Cir. 2007). Although the analysis might end here, *see Bugh*, 329 F. 3d at 512-13; *Burger v. Prelesnik*, — F. Supp. 2d —, 2011 WL 4484441, at *9 (E.D. Mich. Sept. 27, 2011), the Sixth Circuit further considered Bey's claim under the more generalized standard set forth above, i.e., whether the admission of the other-act evidence was so egregious that it deprived the petitioner of a fundamentally fair trial, *see Bey*, 500 F.3d at 521-23. Thus, this Court will do the same – mindful, however, that the scope of evidentiary violations warranting habeas relief is "very narrow[]."[6]

---

[6]As indicated in *Bey*, if the Supreme Court were to hold that propensity evidence deprived a defendant of due process, it would have to be on facts where the other-act evidence was more unfairly prejudicial than that in *Dowling v. United States*, 493 U.S. 342 (1990). There, a robber used a ski mask and a small gun to rob a bank located in a small town. *See id.* at 344. During his escape, the robber hijacked a taxi and unmasked himself. *Id.* Witnesses identified the person driving the hijacked taxi as Dowling. *Id.* Prior to Dowling's trial for bank robbery, he had been acquitted of burglarizing a home, also located in the small town. The homeowner, Henry, told the jury at Dowling's bank-robbery trial that a man wearing a knitted mask with cutout eyes and carrying a small handgun had, with another individual, entered her home approximately two weeks after the

Although this Court might have ruled differently, *see generally*, *U.S. v. Miller*, No. 11-1038, — F.3d —, 2012 WL 763151 (7th Cir. Mar. 12, 2012); *U.S. v. Jenkins*, 593 F.3d 480 (6th Cir. 2010), the Michigan Court of Appeals found the trial court did not abuse its discretion in admitting the other-act evidence (the 1992 raid, 1995 sales and buy, and the gun found upon arrest), reasoning in part:

> Constructive possession of an illegal substance requires proof that the defendant knew of its character. . . . And possession with intent to distribute an illegal substance requires the specific intent to distribute. . . . Evidence of intent is relevant because it negates the reasonable assumption that the incident was an accident. The evidence showed that defendant admitted possessing drugs in 1992, and had actually distributed drugs twice to a particular witness in 1995, and this evidence made it less likely that he acted accidentally or innocently in the case at hand. The more often a defendant acts in a particular manner, the less likely it is that the defendant acted accidentally or innocently, and conversely, the more likely it is that the defendant's act is intentional. Where other-acts evidence is offered to show intent, the acts must only be of the same general category to be relevant.

*McGhee*, 709 N.W.2d at 605-06 (internal citations omitted). But Petitioner's theory at trial was not that whoever possessed the narcotics did so mistakenly, without knowledge, or without intent to distribute. His theory was simply that it was not him. *See Jenkins*, 593 F.3d at 485. As far as the gun found in Petitioner's car upon arrest, the Michigan Court of Appeals correctly found that Petitioner's flight to Georgia and change of identification was admissible as "consciousness of guilt"

---

bank robbery. *Id.* at 345. She further testified "that a struggle ensued and that she unmasked the intruder, whom she identified as Dowling." *Id.* The judge gave a limiting instruction that Dowling had been acquitted and that Henry's testimony was for limited purposes. Dowling was convicted and asserted that Henry's testimony was so prejudicial that it deprived him of a fundamentally fair trial. The Supreme Court disagreed; "[e]specially in light of the limiting instructions provided by the trial judge, we cannot hold that the introduction of Henry's testimony [rose to a violation of constitutionally guaranteed due process]. Plainly Henry's testimony was at least circumstantially valuable in proving petitioner's guilt." *Id.*

(or perhaps as *res gestae*). But Petitioner fairly asserts that FBI testimony about the gun recovered in his car was largely irrelevant and somewhat prejudicial.

Notwithstanding the Court's misgivings about the admission of this evidence, the Court is not prepared to say that the Michigan Court of Appeals' prejudice determination about the other-act evidence was "contrary to" Supreme Court precedent setting forth a very narrow category of egregious evidentiary errors that deprive a defendant of a fundamentally fair trial. First, Northern's testimony regarding Petitioner's two 1995 drug sales, was minimally probative of Petitioner's intent to distribute the drugs found in Petitioner's house in 1998. *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("Admission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." (internal quotation marks, alteration, and citation omitted)). And while Petitioner's stipulation to intent reduced that evidence's probative value relative to its unfair prejudice, it did not make the evidence wholly irrelevant. Regarding the 1992 raid, although well short of Mich. R. Evid. 404(b)'s "identity" safe-harbor, the fact that a green, male-sized jacket with drugs in the pockets was found in that raid and in the 1998 raid, coupled with the fact that Petitioner was arrested at 483 Montana in 1992, was probative of the fact that the drugs found in 1998 belonged to Petitioner.

Regarding the risk of the jury drawing a propensity inference against Petitioner, the Court must consider that unfair prejudice in view of steps taken to mitigate the prejudice and the other evidence presented at trial. *See Hudson v. Lafler*, 421 F. App'x 619, 629 (6th Cir. 2011) ("To be sure, an erroneous-admission-of-evidence claim is different than a sufficiency-of-evidence claim. But when federal courts decide whether a state evidentiary error amounts to a due process violation, they consider the strength of the other evidence of guilt." (citation omitted)).

Turning first to mitigation, the Court notes that when a third officer testified to the raid in 1992, Petitioner's counsel objected and the trial judge gave the jury a limiting instruction:

> [PETITIONER'S COUNSEL]: Judge, I guess I need to preserve the record on this. I just need to object. There was some argument as to whether or not 404(b) evidence would be admissible. . . .
>
> Judge, I'm afraid to the extent that [the prosecutor is] going to require us to retry that entire case, she's adding evidence that's cumulative. It's more – she's put on more evidence about [1992] than [1998] Judge.
>
> [THE COURT]: All right. . . .
>
> [THE COURT]: Ladies and gentlemen of the Jury, I'm going to instruct you later on, but Mr. McGhee is not being charged with the 1992 drug case. So please, this is for a very limited purpose. Later on I'll explain to you the purpose for which you can consider it, but do not consider it for this particular case as guilt or that he's a bad person because of something that happened in 1992.

(Tr. II at 147.) And, at the close of evidence, the trial judge followed through on his promise:

> Now, you've heard also evidence – and this is very important for you to consider this evidence for only a very limited purpose.
>
> You heard evidence that was introduced to show that the Defendant committed other crimes for which he's not on trial. If you believe this evidence, you have to be very careful not to consider it for certain purposes. You may only think about whether this evidence tends to show:
>
> > A, that the Defendant knew what the things found in his possession were; or –
> > B, that the Defendant acted purposefully; that is, not by accident or mistake, or because he misjudged the situation; or –
> > C, that the Defendant used a plan, scheme, or characteristic scheme that he has used before or since; or –
> > D, who committed the crime that the Defendant is charged with.
>
> You must not consider this evidence for any other purpose. For example, you must not decide it shows the Defendant's a bad person

> or likely to commit crimes. You must not convict the Defendant here
> because you think he's guilty of other bad conduct.

(Tr. III at 350-51.) Moreover, in his closing statement, Petitioner's counsel emphasized to the jury the limited purpose of the other-act evidence:

> And [the prosecution is] going to ask you, based upon an allegation from '92 and a very suspect questionable allegation from '95 of Lamark Northern – very suspect and questionable . . . . They're going to ask you, based upon these other things, let's put them together and just meld it all together and say, "Oh, yeah, we – now, that's proof beyond a reasonable doubt." . . .

> Well, I'm going to tell you this: The charging instrument that the prosecutor read to you in opening was a charging instrument that related to September 14th, 1998, and no other date. Absolutely no other date.

(Tr. III at 316-17.) The trial court's limiting instructions and counsel's arguments served to mitigate the unfair prejudice from the admission of the other-act evidence.

There was also other evidence of guilt presented. Petitioner owned the home and car where the drugs were found, had the authority to rent the property, and, based on the many old papers found at the apartment, lived in the property before Butler. Butler moved out of Petitioner's property about a month prior to the 1998 raid and testified that he secured the house with the keys inside. Petitioner was billed for utilities in September 1998. On a table inside the house was a form dated August 1998 with a note apparently written just days before the September 1998 raid. The note was for "Crunch," which is Petitioner's nickname. At the bottom of a green box where cocaine was found laid Petitioner's old fishing license.

Butler testified that he did not have access to Petitioner's Grand Prix parked in the garage, and, as far as he knew, the car had been locked. The car was locked when authorities arrived. Yet, inside the back-seat console, authorities found a quantity of drugs consistent with distribution.

A grand jury indicted Petitioner in 1998. (Tr. III at 185-86.) The indictment was widely published in the local papers. (Tr. III at 185-86.) Petitioner fled to Georgia thereby abandoning his property. When the FBI found Petitioner two years later, he refused to answer the door and showed agents a driver's license issued to an alias.

Given all of the foregoing, this Court cannot say that the Michigan Court of Appeals' conclusion that the other-act evidence was not unduly prejudicial was contrary to Supreme Court precedent providing that – in extraordinary cases – evidentiary errors may be so egregious as to deprive a defendant of due process. Accordingly, Claim V does not warrant habeas relief.[7]

### D. Claim VII: Other Evidentiary Errors Did Not Deprive Petitioner of a Fundamentally Fair Trial And Any Sixth Amendment Violations Were Harmless Error

In Claim VII, Petitioner asserts that additional evidentiary errors deprived him of a fair trial. In particular, Petitioner claims that the trial judge erroneously (1) excluded Petitioner-favorable evidence regarding events arising from the 1992 raid, (2) allowed testimony regarding the number of raids that took place on the day 483 Montana was raided in 1998, (3) allowed Northern to offer hearsay testimony regarding drug buys or sales in 1995, and (4) limited Petitioner's right to cross examine Northern about the deal he received for his testimony against Petitioner. (Am. Pet. for Habeas at 72.) None of these alleged errors warrant a grant of habeas.

Turning to the first claim of error, the Court agrees with the ruling of the Michigan Court of

---

[7]Petitioner also provides a "Fourth Amendment Analysis" to support his Claim V argument. The essence of this argument is that the 1992 raid evidence should have been excluded because it was obtained through an illegal search and seizure. The Michigan Court of Appeals agreed, and this Court does not dispute that finding. But the Court fails to appreciate how that conclusion alters the analysis just provided. In analyzing Claim II, *supra*, this Court concluded that the admission in violation of the exclusionary rule was not constitutional error.

Appeals that the trial court's admission of 1992 raid evidence favorable to the prosecution while simultaneously excluding related evidence favorable to Petitioner was likely error:

> Here, evidence that the criminal charges stemming from the 1992 search were dismissed and that the civil case stemming from the 1992 search was settled was arguably relevant to assess the credibility of former Pontiac Police Officers Brown, Webb, and Casey. . . .

> [D]efendant's defense was that the drugs belonged to his tenant, not him. Therefore, testimony that defendant had previously admitted owning drugs found in the same house significantly undermined defendant's theory of defense. . . .

> By excluding the evidence, the trial court denied defendant the opportunity to impeach the credibility of the officers' testimony that affected a fundamental element of his defense. Therefore, it was arguably error to exclude the evidence.

*McGhee*, 709 N.W.2d at 620.

Nonetheless, for this Court to grant the relief Petitioner seeks, a particular threshold of prejudice must be met. Under the standard for constitutional errors set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "[i]f the court is certain that the error had no or a small effect, the error is harmless." *Tolliver v. Sheets*, 594 F.3d 900, 924 (6th Cir. 2010). But when "'a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Under the *Brecht* standard, the burden is on the State to show that the error was harmless. *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411-12 (6th Cir. 2009).[8]

---

[8]Petitioner appears to assert that the exclusion also violated his rights protected by the Confrontation Clause. (*See* Am. Mot. for Habeas at 72, 74 (referencing Sixth Amendment and right to confront witnesses).) The Court acknowledges that the inquiry regarding Petitioner's Due Process Clause claim – whether the exclusion of his evidence pertaining to the 1992 raid was so egregious

The Court does not harbor "grave doubt" that the exclusion of Petitioner's 1992 raid evidence had a substantial and injurious effect or influence in determining the jury's verdict. First, even if the former Pontiac police officers had been questioned about a retaliatory motive attributable to the dismissal of the 1992 charges and Petitioner's civil suit against them, this impeachment would not have significantly undermined their testimony. Each officer indicated that they did not recognize Petitioner and could not recall if he was one of the individuals at 483 Montana during their 1992 raid. This would have given the jury good reason to doubt Petitioner's theory of long-held ill will. Further, the jury was privy to the fact that at least two testifying officers, including Webb, refreshed their recollection from their police reports – reports likely prepared before any motive to fabricate. In fact, a police report prepared two days after the 1992 raid suggests that Webb had then already prepared, or at least would very soon prepare, his report. (Dkt. 14-26 at ECF Pg ID 2146.) Relatedly, had Webb been impeached with evidence of his bias stemming from the dismissed charges and subsequent civil suit, any prior consistent statements in his report could have been used to rehabilitate his testimony on redirect.[9] Second, the use of the civil-suit evidence to impeach Webb would have strengthened Webb's testimony in one respect: his testimony that Petitioner was present

as to deny him a fundamentally fair trial – and *Brecht*'s harmless error standard for Confrontation Clause violations are not identical. *See Ege v. Yukins*, 485 F.3d 364, 375 n.5 (6th Cir. 2007). But *Brecht*'s harmless-error standard is more favorable to Petitioner. *See Dey v. Scully*, 952 F. Supp. 957, 974 (E.D.N.Y. 1997) ("Since the fundamental fairness analysis . . . is more stringent than the harmless error standard . . . a deprivation of fundamental fairness can never be harmless."). And because the Court concludes that the allegedly erroneous exclusion is harmless under *Brecht*, Petitioner's due process argument need not be considered separately.

[9]Prior consistent statements are not hearsay when the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Mich. R. Evid. 801(d)(1)(B); *see also People v. Rodriguez*, 216 Mich. Ct. App 329, 331-332 (1996).

at 483 Montana during the 1992 raid. Third, as discussed above, the 1992 raid evidence – which was cabined by a limiting instruction – was only one piece of inculpatory evidence against Petitioner. In short, habeas relief is not warranted on the basis that Petitioner was deprived of certain evidence to show bias on the part of the 1992 raiding officers.

The next two evidentiary-based claims for habeas relief falter under a similar analysis. Petitioner asserts that testimony that the raid of his property was "Number 7" out of a large number of same-day raids deprived him of a fundamentally fair trial because it "made it look like the defendant was part of a huge conspiracy." (Am. Pet. for Habeas at 75.) But the reference was not repeated and Petitioner was not tried on a conspiracy theory. This evidentiary error was not so egregious as to deprive Petitioner of due process.

Petitioner next asserts that he was deprived of a fundamentally fair trial when the trial court permitted Northern's hearsay testimony about (1) a large drug buy where one of the buyers mentioned "Crunch" and (2) Petitioner's discussion with another about cocaine prices. Even granting that this testimony was erroneously admitted, Northern still gave non-hearsay testimony that Petitioner twice sold him drugs in 1995. Moreover, as discussed more fully below, Northern was quite severely impeached. Thus, it is doubtful that his hearsay testimony greatly prejudiced Petitioner. And in the bigger picture, this hearsay evidence was constrained by a limiting instruction on the use of other-act evidence and must be viewed in light of the other evidence presented at trial. The trial court's hearsay error – if it committed one – was not egregious.

Fourth, Petitioner asserts that the trial court erred in preventing him from cross examining Northern on whether Northern could have been charged with conspiracy. Petitioner claims that the possibility of life imprisonment on this charge would have shown the jury Northern's "powerful

motive to lie." (Am. Pet. for Habeas at 77.) But the jury was already given other reasons to question Northern's testimony. On direct, Northern admitted to being convicted of both possession with intent to deliver cocaine and escape. He further admitted to an agreement with the Oakland County prosecutor's office in exchange for grand jury testimony. On cross, Petitioner's counsel brought out the fact that this led to a sentence reduction from 22 years to six. Northern was also impeached with seemingly inconsistent testimony at federal and state grand jury proceedings regarding Petitioner's involvement. Moreover, he admitted to the jury that he would lie under oath if law-enforcement authorities asked him to. Given the impeachment of Northern, and considering the impact of his entire testimony on the overall trial, the Court cannot conclude that the trial court's prohibition against questioning him on a hypothetical conspiracy charge deprived Petitioner of due process, or, to the extent that Petitioner frames this claim under the Confrontation Clause, that it had a substantial and injurious effect or influence in determining the jury's verdict.

Finally, Petitioner asserts that the alleged evidentiary errors "combined to deny [Petitioner] the right to a fair trial." (Am. Pet. for Habeas at 78.) Petitioner again cites no legal authority to support this cumulative error argument. And the case law the Court has reviewed suggests that such a claim is not cognizable on habeas:

> The Supreme Court has repeatedly stated that fundamentally unfair trials violate due process . . . and common sense dictates that cumulative errors can render trials fundamentally unfair. Additionally, the Supreme Court has expressly cumulated prejudice from distinct errors under the Due Process Clause. *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) . . . . Nonetheless, the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (discussing cumulated evidentiary errors). No matter how misguided this case law may be, it binds us.

*Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *see also Sluchak v. Howes*, No. 07-12633, 2010 WL 2740074, at *10-11 (E.D. Mich. July 12, 2010) ("In count five . . . the petitioner argues that the cumulative effect of [the] exclusion [of evidence], coupled with the prior bad acts evidence introduced against him, rendered his trial fundamentally unfair.  The Sixth Circuit, however, has determined that errors multiplied on one another do not meet the ADEPA standard because the Supreme Court has not recognized such a ground for relief.").

Accordingly, Claim VII of Petitioner's Application therefore does not warrant habeas relief.

### E.  Claim IV: Petitioner's Claims that the Prosecutor Engaged in Misconduct Do Not Warrant Habeas Relief

Courts in the Sixth Circuit apply a two-step analysis to determine whether a prosecutor's remarks constituted misconduct.  *U.S. v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003).  "The first part of the test is to determine whether the remarks were indeed improper."  *Id.*  If the prosecutor's statements were improper, the Court "must determine if the remarks were flagrant."  *Id.*

Petitioner asserts that habeas relief is warranted because the Oakland County prosecutor who tried his case (1) made an improper "civic duty" argument; (2) improperly commented on Petitioner's right to remain silent and shifted the burden of proof from the government to Petitioner; (3) improperly vouched for six witnesses and vouched for the State's case by stating facts not in evidence; and (4) asked the jury to consider the other-act evidence produced at trial as "substantive evidence of guilt."  The Court will first determine whether each of these alleged improprieties was in fact improper, and then decide whether the improper acts were so flagrant as to warrant habeas relief.  *See Galloway*, 316 F.3d at 632.

### 1. Civic Duty Argument

Petitioner asserts that the following statement by the prosecutor at the end of her closing argument was an improper "civic duty" argument: "Ladies and gentlemen, this crime happened at the time of 1998. It's time the Defendant be held accountable for his actions, those actions being possessing and distributing on the streets of our County large quantities of controlled substances." (Tr. III at 293-94.)

The Michigan Court of Appeals found that this statement was not improper. *McGhee*, 709 N.W.2d at 595. While recognizing that "prosecutors may not make a civic duty argument that appeals to the fears and prejudices of the jurors," the Appellate Court concluded that "the challenged statement constituted permissible commentary on the evidence and the inferences drawn from the evidence; it did not inject issues broader than the guilt or innocence of defendant into the trial, and no error occurred." *Id.*

Before turning to the merits of this claim for habeas relief, it is again necessary to consider the standard of review. Petitioner says that the Michigan Court of Appeals found his civic-duty claim procedurally defaulted and applied plain error analysis. (Am. Pet. for Habeas at 40.) However, the Appellate Court did not state that it was applying a procedural bar or that it was applying plain error analysis; it instead considered the claim on the merits and found that "no error occurred." At a minimum, the Michigan Court of Appeals addressed the merits in the alternative, and, accordingly, AEDPA deference still applies. *See Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008). And under that deferential standard, this Court cannot say that the Michigan Court of Appeals unreasonably concluded that the prosecution did not make an improper civic duty argument.

"The type of appeal that the Sixth Circuit has considered improper is one where the

prosecutor urges the jury to convict the defendant in order to send a message to other potential criminals in the community." *Clarke v. Warren*, No. 05-60151, 2011 WL 2580686, at *11 (E.D. Mich. June 29, 2011) (citing *U.S. v. Ghazaleh*, 58 F.3d 240, 246 (6th Cir. 1995)); *see also United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) (finding that prosecutor's statement – "And I'm asking you to tell her and all of the other drug dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky" – deprived defendant charged with conspiracy to distribute cocaine of a fair trial despite non-contemporaneous curative instruction). It is possible that in referring to the "streets of our County" the prosecutor suggested to the jury that Petitioner's conviction would deter drug dealing in Oakland County. But those words, taken in context, are better understood as eliciting the jury to convict Petitioner because of his own actions as opposed to solving some community-wide drug problem: "*[T]his crime* happened at the time of 1998. It's time the *Defendant* be held accountable for *his* actions, *those actions* being possessing and distributing on the streets of our County large quantities of controlled substances." (Tr. III at 293-94 (emphases added).) In *U.S. v. Ghazaleh*, the Sixth Circuit found a similar statement by the prosecution – "These folks are drug dealers, ladies and gentlemen. They are the ones that have come in here and they've plagued the community with this kind of stuff" – did not rise "to the level of impropriety and prejudice required to reverse a conviction." 58 F.3d 240, 246 (6th Cir. 1995); *cf. Solivan*, 937 F.2d at 1146 (finding civic-duty argument deprived defendant of a fair trial where prosecutor elicited jury to send a message to "all of the other drug dealers like [the defendant]"). Arguably then, the statement was not an improper "civic duty" argument. And if its arguable, under AEDPA, the Michigan Court of Appeals decision cannot be disturbed by this Court.

## 2.  *Commenting on Petitioner's Pre-Miranda Silence*

Petitioner next argues that the prosecutor violated Petitioner's Fifth Amendment rights by impermissibly commenting on his silence.  (Am. Pet. for Habeas at 46-47.)  In support of this claim, Petitioner cites to several statements from the prosecution's closing argument.  For instance, "If this phantom renter was renting the house from the Defendant in 1998, how easy would it be to say, [c]all the police[,] [']You got the wrong person.' . . . 'I was renting the house to Joe Smith.'  That did not occur." (Tr. III at 288-89.)[10]  And, "in addition to this argument of this phantom renter who has been unidentified – and no effort has been made to indicate to law enforcement who this unidentified renter is, even though the Defendant was gone for two years and four months. . . ."  (Tr. III at 338; *see also* Tr. III at 330 (prosecutor's statement that, as compared to 1992, "he can either let his friends go down with the ship, or he can own up to what he did.  In 1998, he takes off").)

The Michigan Court of Appeals considered these statements and concluded that there was no prosecutorial misconduct or Fifth Amendment violation.  More specifically, the Appellate Court stated,

> A prosecutor may comment on a defendant's failure to report a crime when reporting the crime would have been natural if the defendant's version of the events were true.  Furthermore, a prosecutor may comment on the inferences that may be drawn from a defendant's flight.  Moreover, attacking the credibility of a theory advanced by a defendant does not shift the burden of proof.  Because the prosecutor's statements were proper commentary on the weaknesses of defendant's theory of defense, and they referred to prearrest, pre-*Miranda* warning conduct, the statements did not constitute prosecutorial misconduct.

---

[10]The trial transcript literally states: "how easy would it be to say, 'Call the police. You got the wrong person.'" It is clear to this Court that this was transcription error and the prosecutor's statement was in fact "how easy would it be to say, call the police, 'You got the wrong person.'"

*McGhee*, 709 N.W.2d at 618 (internal citations, quotation marks, and alteration omitted).

Petitioner, relying primarily on *Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2007), challenges this conclusion. In *Girts*, the prosecutor made three questionable remarks at closing, including, "Ladies and gentlemen, we don't have to tell you how [cyanide] was introduced into her system. We know that it was ingested. And there is only one person that can tell you how it was introduced, and that's the defendant." *Id.* at 755. The Sixth Circuit concluded that the use of the habeas petitioner's prearrest silence as substantive evidence of guilt violated his Fifth Amendment privilege against self-incrimination. *Id.* at 758.

But *Girts* is procedurally distinct from this case, which is dispositive of this claim of error. In *Girts*, the Sixth Circuit found that the state court had invoked a state procedural bar when it concluded that the petitioner had not objected to the prosecutor's prearrest-silence comments at trial. *See Girts*, 501 F.3d at 754-55 ("[W]e find Petitioner's underlying due process claim to be procedurally defaulted."). Accordingly, although not explicitly stated in *Girts*, the Court of Appeals would not have applied AEDPA deference to the state court's decision on the petitioner's pre-*Miranda*-silence claim. *See James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) ("Where a state court does not reach the merits of a federal claim, but instead relies on a procedural bar later held inadequate to foreclose federal habeas review, we review de novo."); *cf. Montes v. Trombley*, 599 F.3d 490, 494 (6th Cir. 2010) ("[I]f a claim is fairly presented to the state courts, but those courts fail to adjudicate the claim on the merits, then the pre-AEDPA standards of review apply. Under such review, questions of law, including mixed questions of law and fact, are reviewed de novo . . . ." (internal citation omitted)). Indeed, in holding that the prosecutor's statements violated the petitioner's Fifth Amendment rights, the Court in *Girts* relied on *Combs v. Coyle*, 205 F.3d 269

(6th Cir. 2000) – a case "decided under a de novo standard of review." *Jones v. Trombley*, 307 F. App'x 931, 934 n.1 (6th Cir. 2009) (distinguishing *Combs*, 205 F.3d at 281); *see also Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009) ("While this court [in *Combs*] has held that pre-*Miranda* silence cannot be used as substantive evidence of guilt, it did so under a pre-AEDPA, de novo standard of review.").

In this case, the Michigan Court of Appeals invoked no procedural bar, and, in addressing the merits of Petitioner's argument, concluded that because the prosecutor's comments "referred to prearrest, pre-*Miranda* warning conduct, the statements did not constitute prosecutorial misconduct." *McGhee*, 709 N.W.2d at 618. De novo review is therefore improper. And in view of the deference owed this conclusion under AEDPA, the following analysis is squarely on point:

> [Petitioner] now argues that finding a constitutional bar to the prosecution's reference to his pre-*Miranda* silence is a natural extension of the Supreme Court's holdings in *Miranda* and its progeny. Habeas corpus relief is available if a state court unreasonably refuses to extend Supreme Court precedent to a new context. [*Williams v. Taylor*, 529 U.S. 362, 407 (2000)]. However, this part of the unreasonable application test is of no help to [Petitioner] because the state court properly noted that the federal courts of appeal have reached differing conclusions regarding the use of a defendant's pre-*Miranda* silence . . . . [*Michigan v. Jones*, No. 237081, 2003 WL 22113959, at *1 (Mich. Ct. App. Sept. 11, 2003)] (footnote omitted). *See also Narlock v. Hofbauer*, 118 Fed. Appx. 34, 35 (6th Cir. 2004) (per curiam) (holding that a state court's admission of postarrest, pre-*Miranda* silence could not be said to be contrary to or an unreasonable application of clearly established federal law) . . . .
>
> The Supreme Court may ultimately determine that the right against self-incrimination extends to a defendant's pre-*Miranda* silence. However, the state court's analysis was not objectively unreasonable in light of the authority that it cited from the Fifth, Ninth and Eleventh Circuits.

*Jones*, 307 F. App'x at 933-34. Accordingly, as in *Jones*, "[s]ince the state court's analysis was not

based on an unreasonable application of Supreme Court precedent or an unreasonable refusal to extend that precedent," Petitioner has "not established sufficient grounds for federal habeas corpus relief." *See id.* at 934.

### 3. Vouching for Witnesses and the State's Case

The Sixth Circuit has said that vouching "'occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness,' or through 'comments that imply that the prosecutor has special knowledge of facts not in front of the jury.'" *Wilson v. Bell*, 368 F. App'x 627, 633 (6th Cir. 2010) (quoting *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). "It is worth noting . . . that the Sixth Circuit has never granted habeas relief for improper vouching." *Williams v. Lafler*, No. 2:08-10472, 2011 WL 3758488, at *14 (E.D. Mich. Aug. 24, 2011) (citing *Byrd v. Collins*, 209 F.3d 486, 537 & n.43 (6th Cir. 2000)).

Petitioner asserts that the prosecutor improperly vouched for six witnesses: Northern, Butler, Bender, and the three former Pontiac police officers who testified regarding the 1992 raid (Brown, Webb, and Casey). Petitioner also argues that the prosecutor vouched for the State's case against Petitioner by using facts not in evidence. The Michigan Court of Appeals (mostly) addressed the prosecutor's alleged vouching for Northern on the merits. *See McGhee*, 709 N.W.2d at 616-17. But the Appellate Court found that Petitioner's other claims of vouching were procedurally barred. *McGhee*, 709 N.W.2d at 617. This Court will therefore first consider Petitioner's claims regarding Northern and then determine whether Petitioner has shown the requisite "cause and prejudice" for setting aside the state-court procedural bar.

Petitioner asserts that the prosecutor vouched for Northern in four ways. At least one of

these alleged instances was clearly not vouching, however. On direct, the prosecutor asked Northern, "Do you remember what the agreement was that you had with the Oakland County Prosecutor's Office?" to which Northern responded, "That the prosecutor would stipulate to a resentencing in exchange for truthful testimony against several defendants." (*See* Am. Pet. for Habeas at 42 (citing Tr. III at 53-54).) This was merely an inquiry into the terms of Northern's agreement. The Sixth Circuit "has consistently held it is not improper vouching to refer to a promise to testify truthfully as part of a plea agreement." *See U.S. v. Sherrills*, 432 F. App'x 476, 483 (6th Cir. 2011); *see also U.S. v. Francis*, 170 F.3d 546 (6th Cir. 1999) (explaining that it is not improper for a prosecutor to "elicit testimony about [a plea agreement's] terms" or "refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.").

The other three alleged instances of prosecutorial vouching for Northern are more difficult. First, on redirect examination, the prosecutor and Northern engaged in the following colloquy:

> [PROSECUTOR:] Would you lie for us under oath?
> [NORTHERN:] (No verbal response)
> Q. Lamark, would you do it?
> A. If you asked me to.
> Q. You would?
> A. Yes, I would.
> Q. Okay. Did we ask you to do that?
> A. No.
> Q. Isn't it in fact a part of your agreement that you have to tell the truth?
> A. Yes.
> Q. *And that if we find out at any time that you've lied that the agreement was null and void?*
> A. That's my understanding.

(Tr. III at 131 (emphasis added).) During the preceding cross examination, Northen had admitted to the jury that the resentencing agreement was still in effect. (Tr. III at 100.) Thus, it is

conceivable that the prosecutor's subsequent use of the term "any time" on redirect improperly suggested to the jury that if Northern was not then testifying truthfully, she would recommend that the agreement be rescinded. *See Francis*, 170 F.3d at 550 ("[T]he potential for impropriety emerges . . . when a prosecutor explains that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to. Because that recommendation is dependent upon whether the witness testifies truthfully, it is easy for a prosecutor to imply, either intentionally or inadvertently, that the prosecutor is in a special position to ascertain whether the witness was, in fact, testifying truthfully."). Second, at closing, in an attempt to minimize Northern's surprising candidness as quoted immediately above, the prosecutor stated: "But that is Lamark Northern for you. If there's one thing Lamark Northern is, it's honest. . . . But the fact of the matter is, what Lamark Northern has never done is exaggerate what he's done." (Tr. III at 326.) Third, Petitioner claims that prosecutorial vouching occurred when the trial court admitted into evidence Northern's resentencing agreement that included a statement that Northern had agreed to take a polygraph test. On this last point, the Michigan Court of Appeals found that "[i]t is plain error to present to a jury a reference to taking a polygraph test" and "it is possible that the jury resolved the witness's credibility by relying on the polygraph reference." *McGhee*, 709 N.W.2d at 617. The Court will assume that each of these amounted to improper vouching for Northern, and will consider the flagrancy of this vouching – along with any other improper statements – below. *See Galloway*, 316 F.3d at 632.

Turning to the remainder of Petitioner's claims of prosecutorial vouching, the Michigan Court of Appeals found that those claims were unpreserved and did not address them on the merits. *McGhee*, 709 N.W.2d at 617. Federal habeas relief is precluded on claims that a petitioner has not

presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when (1) a petitioner fails to comply with a state procedural rule, (2) the rule is actually relied upon by the state courts, and (3) the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001).

Here, the Michigan Court of Appeals relied upon the contemporaneous-objection rule in concluding that Petitioner's "remaining claims of vouching for witnesses were unpreserved," *McGhee*, 709 N.W.2d at 617. *See Wallace v. Ludwick*, No. 08-11747, 2009 WL 2840500, at *3 (E.D. Mich. 2009) ("Michigan's contemporaneous-objection rule requires that defendants make timely and specific objections at trial in order to preserve claims for appellate review." (citations omitted)). This is an adequate and independent state procedural rule. *See Jones v. Trombley*, 307 F. App'x 931, 932 (6th Cir. 2009). Therefore, Petitioner's other claims of prosecutorial vouching are procedurally defaulted unless Petitioner can show cause and prejudice to excuse that default or show that a failure to consider the claims would result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

Petitioner asserts ineffective assistance of trial counsel to excuse his procedural default. (Am. Pet. for Habeas at 40.) "Ineffective assistance of counsel can provide the necessary 'cause' for the procedural default." *See Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that (1) his attorney's performance was deficient, and (2) that the deficient performance

prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  And "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

Finally, this Court must apply the *Strickland* standard with "scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve."  *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 689-90).

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . .  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.

*Id.* (citing *Strickland*, 466 U.S. at 690).

Petitioner asserts that the prosecutor vouched for three former Pontiac police officers who testified regarding the 1992 raid of 483 Montana. In particular, Petitioner points to the following portion of the prosecutor's closing argument:

> And this phantom person also decided to come in and store in that house a pound and a half of marijuana in a secret compartment under the sink.
>
> And the same person also goes into the garage, a locked garage, into a locked vehicle and puts in 250 grams of cocaine . . . . Yes, this phantom person did all of that.
>
> But maybe the police were in on it.
>
> *It's suspect, he [opposing counsel?] said, that – the similarities between the 1992 raid, which we'll get to in a minute, and the 1998 raid. Suspect?*
>
> *I would say it's more than highly coincidental that six years later in the house where the Defendant lives they find cocaine hanging in a jacket in the breast coat pocket of a man's suit jacket in the closet.*
>
> *Six years later where do they find additional cocaine? In the same place. And that's suspect? On the part of who? The Police? On the part of Jim Webb, Dan Casey, and – I can't remember the other name right off the top of my head – who testified that they were retired prior to this raid in 1998 ever occurring?*

(Tr. III at 284-85 (emphasis added).)

Petitioner's counsel was not ineffective for failing to object to the emphasized statements because they did not constitute improper vouching. Read in context, it is clear that the prosecutor was attempting to eliminate possible defense theories: first, that the drugs were placed in Petitioner's house by an unknown individual; second, that the drugs were placed at 483 Montana by the police. The prosecutor neither indicated a personal belief in the officer witnesses' credibility nor did she imply that she had special knowledge of facts not before the jury. *See Wilson*, 368 F. App'x at 633.

Moreover, Petitioner's trial counsel addressed this particular remark in his closing: "I never suggested that the police did anything wrong in this case. I've never suggested that as it relates to planting anything on Mr. McGhee. I've never suggested it. I don't want you to draw that inference." (Tr. III at 319.) In short, the Court cannot find that Petitioner's trial counsel's performance fell below the objective standard of reasonableness because he failed to make a futile objection. This is especially so in view of counsel's reasonable decision to clarify Petitioner's theory of the case in his closing argument instead of making a questionable contemporaneous objection.

Next, Petitioner cursorily asserts that "further vouching occurred" when the prosecutor used facts not in evidence:

> If the only time that juries could convict people of crimes is when someone actually saw them commit the crime; we wouldn't have convictions. People would not be held accountable for their actions.
>
> Cases don't happen where officers walk up to somebody and they have just shy of a kilo of cocaine in their pocket. It doesn't happen.
>
> Do you think this is the first case where a search warrant was executed and nobody was home? Absolutely not. And that's why the law allows you to use your common sense and use you reasonableness when you draw a conclusion.

(Am. Pet. for Habeas at 44 (citing Tr. III at 337).) Petitioner is correct that "[i]t is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'" *Byrd v. Collins*, 209 F.3d 486, 535 (2000).

But Petitioner has not established that trial counsel's decision to forgo an objection was objectively unreasonable. Counsel could have reasonably concluded that it was not prejudicial for the jury to assume that officers do not walk up to someone with "a kilo of cocaine in their pocket"

or that Petitioner's case was not the "first case where a search warrant was executed and nobody was home." These facts are mundane, not specific to Petitioner's case, and within the common knowledge of a rational juror. In fact, the prosecutor followed up on the above statements by urging jurors to use their common sense: "And that's why the law allows you to use your common sense and use your reasonableness when you draw a conclusion." (Tr. III at 337.)

Finally, Petitioner asserts that the prosecutor vouched for Butler (Petitioner's former tenant) and Bender (a neighbor of 483 Montana). In support of this claim, Petitioner quotes the following remarks from the prosecutor's closing argument: "'I think Michael Butler was a very honest person. . . . But his testimony was extremely credible, as well as that of the next door neighbor.'" (Am. Pet. for Habeas at 43 (quoting Tr. III at 283).) Petitioner is correct that a prosecutor should not express a personal belief that a witness is credible. *See Wilson*, 368 F. App'x at 634. Nonetheless, the Court cannot find that Petitioner's trial counsel was ineffective for failing to object. This is because the prosecutor's full statement was: "I think Michael Butler was a very honest person. *And that's up for you [the jury] to decide whether you believed him.* But his testimony was extremely credible, as well as that of the next door neighbor." (Tr. III at 283 (emphasis added).) In essence then, the prosecutor provided the jury with the very instruction that an objection would have provided. It was therefore not objectively unreasonable for counsel to make a strategic decision not to object. *See Patterson v. Brandon*, No. 3:07-0029, 2010 WL 1417754, at *17 (M.D. Tenn. Mar. 31, 2010) ("[T]rial counsel often 'refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality.'" (quoting *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991))).

Because Petitioner has not shown that trial counsel was ineffective for failing to object to the procedurally-barred instances of prosecutorial vouching, this Court may only consider those claims if the "failure to consider [them] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This exception requires a petitioner to show that a constitutional violation probably resulted in the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To make a showing of actual innocence, a petitioner must hurdle a high bar: he must show that "it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 321 (1995). And, to be credible, a claim of actual innocence requires a petitioner to support his allegations of constitutional error with new reliable evidence that was not presented at trial. *Id.* at 324. Petitioner has made no such showing. Therefore, his claims that the prosecutor committed misconduct by vouching for the State's case as well as witnesses Brown, Webb, Casey, Butler, and Bender are procedurally barred.

### 4. *Reference to Other-Act Evidence to Show Substantive Evidence of Guilt*

Petitioner next argues that the prosecutor, during opening and closing statements, asked the jury to consider other-act evidence as substantive evidence of guilt rather than for a permissible non-propensity purpose. The Michigan Court of Appeals considered and rejected this argument:

> When the challenged comments are read in context, they clearly indicate that the prosecutor argued that the MRE 404(b) evidence was relevant to defendant's knowledge, intent, and scheme, all clearly proper purposes under MRE 404(b). . . . [T]he prosecutor here did not argue that the evidence was relevant with respect to some improper purpose.

*McGhee*, 709 N.W.2d at 619. There is nothing unreasonable about the Michigan Court Appeals' interpretation of the prosecutor's statements.

Regarding the 1992 raid evidence, the prosecutor attempted to argue within the "identity" safe harbor of Mich. R. Evid. 404(b): "I would say it's more than highly coincidental that six years later in the house where the Defendant lives they find cocaine hanging in a jacket in the breast coat pocket of a man's suit jacket in the closet." (Tr. III at 285.) Moreover, just moments later, she told the jury the limited nature of the 1992 raid evidence:

> Now the Judge is going to tell you that with regard to the 1992 evidence that's not evidence that the Defendant's a bad person, and you can't use it to say that the Defendant must – must be likely to commit crimes. But he is going to tell you that it does have a purpose. And let me tell you, the Judge would not let evidence into this courtroom . . . unless it did have a proper purpose.

> And that proper purpose, the Judge is going to tell you, you can use that evidence in order to determine who committed the crime in 1998, and did the Defendant act by mistake, or was there a similar motive or – modus operandi in this case in 1998.

(Tr. III at 286.) Thus, read in context, the prosecutor's statements regarding the 1992 raid evidence did not elicit the jury to draw an improper propensity inference.

Petitioner next asserts that the prosecutor elicited the jury to consider Northern's testimony about Petitioner's drug sales in 1995 for propensity purposes. At closing, the prosecutor stated: "Did Lamark Northern know that the Defendant was in fact a drug dealer in 1995? Absolutely. Does that also help show the knowledge of the Defendant's property in 1998 and what [Defendant] had in his home in 1998? Absolutely it does." (Tr. III at 287.) Elsewhere in her closing, the prosecutor stated, "[a]nd you don't know [that defendant had knowledge of the drug's presence at 483 Montana only] because he sold drugs to Lamark Northern in 1995. You know it because of all of those pieces of evidence combined." (Tr. III at 292.) And in her closing rebuttal she said: "[opposing counsel] says [the 1992 raid and Northern's testimony] has nothing to do with 1998. It

50

has absolutely everything to do with 1998." (Tr. III at 338.) These statements could be interpreted as impermissibly arguing propensity. Accordingly, the Court will consider their prejudicial impact below. *See Galloway*, 316 F.3d at 632.

### 5. Cumulative Effect of Improper Statements

If the prosecutor's statements were improper, the Court "must determine if the remarks were flagrant." *Galloway*, 316 F.3d at 632. Four factors are considered in determining whether the prosecutor's improper remarks were flagrant: "1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Galloway*, 316 F.3d at 632. Further, "[o]n habeas review, a court's role is to determine whether [alleged prosecutorial misconduct] was so egregious as to render the entire trial fundamentally unfair." *Millender v. Adams*, 376 F.3d 520, 526 (6th Cir. 2004) (internal quotation marks and citations omitted); *see also Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (applying same fundamental fairness standard pre-AEDPA). "It is [also] worth noting . . . that the Sixth Circuit has never granted habeas relief for improper vouching." *Williams v. Lafler*, No. 2:08-10472, 2011 WL 3758488, at *14 (E.D. Mich. Aug. 24, 2011) (citing *Byrd v. Collins*, 209 F.3d 486, 537 & n.43 (6th Cir. 2000)).

In the previous subsections, this Court found that three statements by the prosecution arguably constituted impermissible vouching for Northern. In addition, the Court found that the prosecutor, during closing arguments, arguably elicited the jury to consider Northern's testimony about Petitioner's drug sales in 1995 for impermissible propensity purposes. Considering the four factors set forth in *Galloway*, the Court cannot conclude that the combined effect of these statements

violated Petitioner's right to a fundamentally fair trial.

Regarding whether the prosecutor misled the jury on redirect of Northern, she probably did imply that if Northern was not testifying truthfully, Northern's resentencing agreement could be rendered void at "any time." On the other hand, the jury could have understood the prosecutor as permissibly asking Northern to merely recount the terms of his agreement: "Isn't it in fact a *part of your agreement* that you have to tell the truth? . . . *And* that if we find out at any time that you've lied that the agreement was null and void?" (Tr. III at 131 (emphasis added).) So construed, the prosecutor's statement was not even improper. In any event, the prosecutor did not go so far as to explicitly state that she would in fact void the agreement if Northern was not testifying truthfully. Indeed, Northern had already completed his sentence at the time of his testimony. In all, the prosecutor's questioning on redirect of Northern, while misleading and prejudicial, was not significantly so.

As for the prosecutor's alleged vouching for Northern during closing, Petitioner overlooks his counsel's contemporaneous objection followed by the trial court's instruction that "[y]ou can comment on the evidence in the courtroom, but you can't personally vouch for the credibility of a witness." (Tr. III at 328.) This drastically reduced any prejudice stemming from that particular statement.

Regarding the admission of Northern's plea agreement, although the jury had the opportunity to examine the document during deliberations, it was submitted to the jury along with a number of other exhibits. *See McGhee*, 709 N.W.2d at 617. More importantly, the agreement did not state whether Northern had passed the polygraph test – it only provided that he had agreed to take one.

*See id.*[11]

The prosecutor's arguably improper propensity remarks during closing almost exclusively involved Northern's testimony about Petitioner's drug sales in 1995. Regarding the tendency to mislead, it is noteworthy that the prosecutor arguably implored the jury to consider this other-act evidence as it pertains to Petitioner's knowledge of the drugs in 1998 – a permissible solicitation. (*See* Tr. III at 287, 292.) Further, as discussed, the trial court provided limiting instructions about the use of other-act evidence, and Petitioner's counsel emphasized the limited purpose of the other-act evidence in his closing remarks.

The Court acknowledges that the other evidence of guilt in this case was not overwhelming. On the other hand, separately considered, each of the improper remarks were not unduly prejudicial or misleading. And their combined prejudice was significantly tempered by the fact that Northern's testimony was quite severely impeached. On balance, the Court concludes that while certain remarks by the prosecutor were likely improper, combined, they were not so "egregious as to render the entire trial fundamentally unfair." *Millender*, 376 F.3d at 526; *see also Serra*, 4 F.3d at 1355.

### F. Claim III: Petitioner's Various Claims that Trial Counsel Was Constitutionally Ineffective Do Not Warrant Habeas Relief

As previously stated, to show a violation of the Sixth Amendment right to effective assistance of counsel, Petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. And "[e]ven under

---

[11]The Court adds that the Michigan Court of Appeals found that while the admission of Northern's resentencing agreement was probably error since it included the polygraph reference, Petitioner had "not demonstrated that the erroneous admission affected the outcome of the lower court proceedings, the error does not require reversal." *McGhee*, 709 N.W.2d at 617. This conclusion is owed deference under AEDPA.

*de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 131 S.Ct. at 788. But because the Michigan Court of Appeals addressed the ineffective assistance of counsel claims set forth above, a second layer of deference applies under the AEDPA. As explained by the Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S.Ct. at 788.

With this doubly-deferential standard of review firmly in mind, the Court addresses Petitioner's ineffective assistance of counsel claims in turn.

### 1. Failing to Discover that Webb Was One of the Defendants Named in Plaintiff's Civil Suit

Petitioner asserts that trial counsel failed to discover that Petitioner had sued Sergeant Webb. Petitioner explains that this prejudiced his defense in two interrelated ways: first, had trial counsel learned that Petitioner sued Webb, trial counsel's argument for the admission of the ultimately-excluded civil-suit evidence would have been stronger, and, second, had the trial court admitted the civil-suit evidence, counsel's cross examination of Webb would have been more effective. (*See* Am. Pet. for Habeas at 27 n.2.)

Although Petitioner argues that the Michigan Court of Appeals did not fully appreciate this argument (*see id.*), the Appellate Court did recognize Petitioner's claim "that counsel failed to

54

discover or argue that . . . Webb was biased because he was a defendant in the civil suit stemming from the 1992 raid," and concluded that "[w]ith respect to officer bias, although Webb's name was not specifically mentioned, defense counsel's argument against the MRE 404(b) evidence clearly encompassed Webb's actions." *McGhee*, 709 N.W.2d at 613-14. Thus, the Michigan Court of Appeals implicitly concluded that, in view of counsel's other arguments, failing to inform the trial court that Petitioner had sued Webb was not objectively unreasonable under *Strickland*.

Under the combined AEDPA-*Strickland* standard, this Court cannot say that the Michigan Court of Appeals unreasonably concluded that trial counsel's arguments did not fall below *Strickland*'s objective standard of reasonableness. Certainly counsel's argument for the admission of the civil-suit evidence would have been stronger had he informed the trial court that the evidence would be used to impeach a testifying officer. But counsel did make other persuasive arguments for its admission:

> the civil matter, we're talking about a situation that . . . may or may not, Judge, go to the fact that if someone may have been perturbed, that, hey, [my client] had gotten away once, or if there was some indication that – if there had been some motivation to have another situation occur relative to my client, it would be probative. . . .

> Additionally, Judge, there's some question about where he received money and he's a drug dealer and how he had his funds. Judge, that was a fairly decent and tidy sum of money that he received . . . for a settlement.

> [The prosecution does not] want the Jury to hear . . . the rest of the story as it relates to those drugs and what transpired after and what motivations may – you know, may have created for another raid.

(Tr. I at 10-11.) In view of these arguments, the Michigan Court of Appeals was not unreasonable in finding that counsel was not ineffective for failing to additionally argue that the evidence was useful for impeachment.

Alternatively, for reasons already discussed in addressing Claim VII, this Court finds that Petitioner has not shown a reasonable probability that the result of his trial would have been different had counsel made the impeachment argument and had the trial court permitted counsel to use the evidence to impeach Webb.

### 2. Failing to Discover that "Ezell Moore" was the Name on the Warrant Executed in 1992

Petitioner claims that counsel was ineffective for failing to discover that, in 1992, authorities were not searching for Petitioner but instead for someone named Ezell Moore. This argument is problematic in at least two respects. First, the Michigan Court of Appeals found that had counsel challenged the admission of the 1992 evidence on this basis, the argument would have been futile under Michigan law. *McGhee*, 709 N.W.2d at 614 (citing *People v. Daniel*, 523 N.W.2d 830 (1994)). Petitioner presents no argument to the contrary and it is well established that counsel is not ineffective for failing to make futile objections. Second, assuming the objection would not have been futile, this error did not appreciably prejudice Petitioner's trial. Even if the 1992 warrant named the wrong individual, the property then in question was 483 Montana, and, more importantly, Petitioner was arrested on the property during the raid. Petitioner has not shown that trial counsel was ineffective for failing to discover that Petitioner was not named on the search warrant authorities executed in 1992.

### 3. Failing to Challenge the Admission of Firearm Evidence

Petitioner next claims that counsel was ineffective in addressing the admission of firearm evidence at trial. Specifically, Petitioner asserts that counsel failed to challenge (1) the prosecutor's statement and officer testimony about a shotgun discovered in the 1992 raid, (2) testimony regarding empty firearm boxes found during the 1998 raid, and (3) the admission of the gun Petitioner was

arrested with in 2001. Petitioner further asserts that trial counsel compounded this last error by implying that the firearm found in 2001 was stolen and that Petitioner was homicidal.

Petitioner has not shown the requisite prejudice to establish that trial counsel was ineffective. The testimony on these points was limited. Regarding the 1992 firearm, Petitioner cites a single statement from a single officer. (Tr. II at 71.) As for the empty gun boxes found in 1998, one officer mentioned that he found a "Highpoint Firearms" box in the same disguised compartment that he found a pound-and-a-half of marijuana. (Tr. II at 111-12.) Another testified briefly that an empty gun box was found in the garage where he also found marijuana. (Tr. II at 183.) In her opening statement, the prosecutor mentioned the firearms found in 1992 once, in passing, and did not mention the empty gun boxes at all. At closing, she mentioned neither. The issue at trial was Petitioner's possession of narcotics – not firearms. Although this supports Petitioner's claim of irrelevance, it also suggests that any propensity inference would be considerably less prejudicial than if Petitioner had been charged with a crime involving violence. Thus, even assuming that objectively reasonable counsel would have challenged the firearm evidence from the 1992 raid or 1998 raid, the jury had no reason to focus on this evidence, and, therefore, Petitioner has not shown that but for counsel's errors, there is a reasonable probability the result of his trial would have been different.[12]

Petitioner argues that the gun FBI agents found when they arrested Petitioner in 2001 was not probative of consciousness of guilt because the arrest was more than two years after the 1998

---

[12]Additionally, the empty gun box testimony was arguably admissible as *res gestae*. And the Michigan Court of Appeals also suggested that the 1992 and 1998 firearm evidence was probative of identity: "the 1992 search uncovered a shotgun and the 1998 search uncovered an empty gun box." *McGhee*, 709 N.W.2d at 606.

raid. Although Petitioner's arrest in Georgia, failure to open the door to the FBI, and presentation of false identification, were all relevant to show that Petitioner harbored guilt about the narcotics found in 1998, the admission of the gun found in Petitioner's car probably ran the risk of the jury drawing a negative character inference without substantial probative value. Nonetheless, for reasons similar to those set forth above regarding the 1992 and 1998 firearm evidence, Petitioner has not demonstrated the prejudice required by *Strickland*. In particular, even if the jury were to infer that Petitioner had a violent character because he owned a gun, the jury's focus at trial was on possession and distribution of narcotics, and, more specifically, whether Petitioner had knowledge of the narcotics found at 483 Montana in 1998.

Petitioner also asserts that trial counsel was ineffective because counsel compounded the prejudicial effect of the admission of the gun by suggesting that it was stolen. On redirect of one of the arresting FBI agents, the prosecutor implied that Petitioner had not registered the gun under his real name. On recross, counsel asked the agent if he knew whether the gun was registered. If the agent responded that the gun was not registered, it would show that Petitioner had not used a false name to register the weapon. But, as Petitioner points out, this answer would imply that Petitioner possessed an unregistered firearm. Given the substantial deference this Court owes to counsel's strategy, the Court cannot say it was objectively unreasonable for counsel to have determined that the latter inference was less prejudicial to Petitioner than the former. In any event, the resulting prejudice turned out to be negligible. The agent responded, "It was [registered]. I did a trace on the weapon. . . . [a]nd it came back to a dealer . . . in Florida." (Tr. III at 181.) The statement that the gun was traced to a dealer is ambiguous – it could refer to a legitimate gun dealer. The agent's testimony went no further, and the Court cannot say that the possibility that the jury

assumed the contrary demonstrates that, absent the agent's statement, there is a reasonable probability that Petitioner's trial would have come out differently.

Finally, Petitioner claims that counsel compounded the prejudicial effect of the admission of the gun recovered during Petitioner's arrest by suggesting that Petitioner was homicidal. At closing, Petitioner's counsel referenced testimony from Northern suggesting that someone with information about drug trafficking could be in danger from those involved in the trafficking. (*See* Tr. III at 129-30, 317.) Counsel then told the jury:

> When he says, "Hey, these innocent people are people who just have information," it may scare you enough to get out of here. Okay? He's found with a gun. You know what guns do? You either go out to kill people, or you protect yourself with it.
>
> And if you're running out of fear, I imagine you may want to possess a weapon. You may just . . . want to. *You may want to go all the way and say, "If I'm going to meet my demise, I may take someone with me."* You may say that.
>
> And the testimony – again, ladies and gentlemen, Mr. McGhee has asked me to specifically – I'll retract that.

(Tr. III at 317-18 (emphasis added).) The emphasized statement is questionable. However, it was retracted by counsel and it was made within the context of a broader explanation for Petitioner's possession of the firearm. As such, the Michigan Court of Appeals did not unreasonably conclude that counsel "did not imply that defendant was potentially homicidal; rather, he implied that defendant felt the need to protect himself from danger" because "he possessed knowledge of his tenant's drug dealing and was afraid." *McGhee*, 709 N.W.2d at 595.

In sum, Petitioner has not established that trial counsel was constitutionally ineffective in addressing evidence of firearms from the 1992 raid, the 1998 raid, or Petitioner's arrest.

### 4. *Failing to Assert that Petitioner's Statement to Webb Was Without Miranda Warnings and Was Coerced*

Petitioner claims that counsel was ineffective because he failed to seek exclusion of Webb's testimony that, in 1992, Petitioner admitted that the narcotics found at 483 Montana were his. The premise for this claim is that the statement to Webb was coerced and given without *Miranda* warnings. This claim fails on two independent grounds.

First, in addressing Claim II, this Court has already concluded that Petitioner has not established that his inculpatory statement in 1992 was given without *Miranda* warnings or that the raiding police officers coerced the statement.

Second, the Michigan Court of Appeals concluded that Petitioner never informed counsel of these facts:

> With respect to the argument[] . . . that defendant's inculpatory statement in 1992 was coerced and taken in violation of his *Miranda* rights, defense counsel did not raise either of these arguments. Nevertheless, counsel cannot be found ineffective for failing to pursue information that his client neglected to tell him. . . . Here, an . . . affidavit by defendant alleged that his statement was coerced and taken in violation of his *Miranda* rights. There is no indication in the record that defendant made these facts known to trial counsel, and no indication in the record that would have reasonably alerted counsel of the need for further investigation.

*McGhee*, 709 N.W.2d at 614. As already noted, Petitioner has not proffered evidence sufficient to rebut the presumption of correctness owed to the Michigan Court of Appeals' factual finding about what Petitioner told (or failed to tell) his counsel. Therefore, the Michigan Court of Appeals reasonably concluded that counsel was not constitutionally ineffective for failing to challenge the admission of Petitioner's inculpatory statement made during the 1992 raid.

### 5. *Implying that Petitioner had Committed a Crime in 1992*

As another claim of ineffective assistance of trial counsel, Petitioner argues that counsel, "for all intents and purposes, simply admitted Petitioner's guilt in [the 1992 case] and absolution of responsibility due to a legal technicality." (Am. Pet. for Habeas at 34.) Petitioner cites the following colloquy from counsel's cross-examination of Webb:

> [PETITIONER'S COUNSEL:] Okay. And you understand that – as far as 1992 goes, you understand the Defendant is not on trial for anything that happened in 1992. You understand that?
>
> [WEBB:] No, I don't. . . .
>
> Q. At any rate, the Defendant is charged with an offense that occurred in 1998. Were you a part of any investigation in 1998 relative to the Defendant, Larry McGhee?
>
> A. No, I wasn't.

(Tr. II at 79-80.)

As the colloquy makes clear, counsel was not suggesting that Petitioner had escaped punishment for possession of the drugs recovered at 483 Montana in 1992; he instead implied that the 1992 charges against Petitioner had little or no relevance to the 1998 charges. To underscore this argument, counsel argued that Petitioner could not possibly be on trial for the narcotics recovered in 1992 because the statute of limitations had expired. Although AEDPA deference is not necessary to resolve this alleged claim of counsel error, the Court adds that the Michigan Court of Appeals reasonably concluded that "[f]rom the context of the questions asked, it appeared counsel was attempting to make clear to the jury that defendant was not on trial for the 1992 acts. The 1992 acts had already been ruled admissible, and counsel was merely trying to limit their prejudicial effect." *McGhee*, 709 N.W.2d at 615.

### 6. Failing to Object to Prosecutorial Misconduct

Petitioner's primary focus regarding trial counsel's failure to object to prosecutorial misconduct surrounds the admission of the 1992 raid evidence. Petitioner asserts:

> [The 1992 raid] evidence was intentionally used to create improper character evidence against Petitioner, encouraging the jury to convict solely because Petitioner was a bad person. It is argued that seeking the admission by the prosecutor was prosecutorial misconduct, which should have been objected to, as well as other instances of prosecutorial misconduct more fully set out in their own issue, *supra*. Further, it is alleged that the admission of the evidence should have been fought much harder, including seeking interlocutory appeal for example.

(Am. Pet. for Habeas at 37.)

This argument is not persuasive. As an initial matter, counsel did challenge the admission of the 1992 raid evidence. In fact, during a pre-trial motion, counsel raised, and the trial court rejected, the very Fourth Amendment theory Petitioner says warranted an interlocutory appeal. (*Compare* Am. Pet. for Habeas at 37 *with* Dkt. 14-8 at ECF Pg ID 1044-47.) Second, when the Michigan Court of Appeals ultimately addressed the issue on direct appeal, it relied on federal case law thereby indicating that the issue was novel for Michigan courts. The Appellate Court also acknowledged that under Ninth Circuit precedent, "the other-acts evidence in this case would not have been barred by the exclusionary rule." *See McGhee*, 709 N.W.2d at 608-09. Third, as a general matter, the Michigan Court of Appeals "rarely grants interlocutory appeals by defendants regarding suppression of evidence issues." *People v. Horton*, No. 234035, 2002 WL 31950754, at *1 (Mich. Ct. App. Dec. 10, 2002). Thus, trial counsel could have reasonably concluded that the Michigan Court of Appeals would not have granted leave for an interlocutory appeal on an evidentiary issue, and, further still, that an appeal on a novel question with conflicting precedent

would not have been successful.  *See Foy v. Renico*, No. 05-CV-70284, 2005 WL 2924391, at *6 (E.D. Mich. Oct. 31, 2005) ("In this case, trial counsel's conduct in failing to file an interlocutory appeal from the trial court's pre-trial evidentiary ruling to exclude petitioner's expert from testifying was not deficient, as the decision whether to file such an appeal required a judgment call on the part of defense counsel and appeals courts rarely grant motions for leave to file an interlocutory appeal.").

As quoted above, Petitioner asserts that trial counsel should have objected to "other instances of prosecutorial misconduct [which are] more fully set out in their own issue." (Am. Pet. for Habeas at 37.)  Although this reference is vague, the Court will separately address counsel's conduct in response to the varieties of prosecutorial misconduct analyzed above.  Regarding the prosecutor's comments on Petitioner's pre-arrest silence, trial counsel made a contemporaneous objection and therefore was not ineffective.  (Tr. III at 288.)  As for Petitioner's claim that the prosecutor made an improper civic duty argument, the Michigan Court of Appeals found that the prosecutor's argument was not improper.  *McGhee*, 709 N.W.2d at 619.  This Court has already determined that this conclusion was reasonable.  It follows that the Michigan Court of Appeals also reasonably concluded that counsel's objection to this alleged misconduct would have been futile.  *See McGhee*, 709 N.W.2d at 614.  Similarly, the Court has already concluded that the prosecutor's closing remarks regarding the 1992 raid evidence did not ask the jury to infer propensity.  Thus, any objection by counsel would have been futile.  As for the prosecutor's closing remarks about the 1995 other-act evidence, this Court previously concluded that it was arguable as to whether the prosecutor even elicited a propensity inference.  Moreover, Petitioner's trial counsel had the opportunity to – and in fact did – argue for a non-propensity use of the other-act evidence during his closing.  (*See,*

*e.g.*, Tr. III at 316-17, 320.) Therefore, counsel's decision to forego a contemporaneous objection was not unreasonable.

Additionally, this Court already found that Petitioner has not demonstrated that ineffective assistance of counsel was the "cause" for failing to preserve his claims that the prosecutor vouched for the State's case as well as witnesses Brown, Webb, Casey, Butler, and Bender.

As for the prosecutor's alleged vouching for Northern, even assuming trial counsel should have objected to the prosecutor's "any time" statement on redirect of Northern, and should have sought redaction of the polygraph reference in Northern's resentencing agreement, the errors did not prejudice Petitioner's defense to the extent set forth in *Strickland*.[13]  In addressing these two alleged instances of vouching, this Court previously concluded that they were not so egregious as to violate Petitioner's right to a fundamentally fair trial.  Although the prejudice standard under *Strickland* is less onerous, the Court's earlier reasoning applies here.  Petitioner has not demonstrated that but for counsel's failure to object to these two claims of prosecutorial vouching, there is a reasonable probability that the result of his trial would have been different.

In sum, Petitioner has not demonstrated that trial counsel was constitutionally ineffective in addressing any of the alleged varieties of prosecutorial misconduct.

> 7. *Failing to Seek Dismissal Based on People v. Glass, 627 N.W.2d 261 (Mich. 2001)*

The State tried Petitioner on three counts (possession with intent to distribute cocaine, heroin, and marijuana) as set forth in an information.  (Tr. I at 17-18; Tr. II at 9-10.)  Petitioner

---

[13]Regarding the other two alleged instances of prosecutorial vouching for Northern, the Court previously found that the prosecutor's statements on direct examination of Northern were not vouching and counsel objected to the prosecutor's remarks during closing.

asserts that this information was void under state law and that counsel was ineffective for failing to seek dismissal on that basis. In particular, Petitioner explains that prior to the filing of the information in this case, a grand jury indicted him on two counts.[14] (Am. Pet. for Habeas at 37.) A preliminary examination followed, and Petitioner was bound over on the charges in the indictment. (*Id.*) It was not until after the preliminary examination that the prosecution filed an information and Petitioner was arraigned on counts other than those set forth in the indictment. (*Id.*) Petitioner asserts that under the Michigan Supreme Court's decision in *People v. Glass*, 627 N.W.2d 261 (Mich. 2001), the information was void. Further, says Petitioner, the post-indictment preliminary examination did not provide notice of the charges he was ultimately tried on.

The Michigan Court of Appeals, citing *People v. Glass*, agreed with Petitioner that, "[b]ecause an information must be predicated on a complaint and authorized by either bindover after, or waiver of, a preliminary examination, an information following an improper preliminary examination is void." *McGhee*, 709 N.W.2d at 615. The Appellate Court therefore concluded that "the information in the instant case should have been vacated." *Id.*

But, the Michigan Court of Appeals also found that because "proceeding to trial on the information was harmless error," "defense counsel was not ineffective for failing to move to dismiss." *Id.* This Court finds that this conclusion was not an unreasonable application of *Strickland*. In determining that preceding on the information was harmless, the Michigan Court of Appeals relied on a Michigan statute governing amendments to indictments, which provides, in relevant part,

---

[14]Neither the Petition, the State's Response, nor the Michigan Court of Appeals' opinion identifies these two counts. And the "original indictment is not contained in the trial court record." *McGhee*, 709 N.W.2d at 615.

> The court may at any time before, during or after the trial amend the indictment in respect to any defect, imperfection or omission in form *or substance or of any variance with the evidence*. If any amendment be made to the substance of the indictment or to cure a variance between the indictment and the proof, the accused shall on his motion be entitled to a discharge of the jury, if a jury has been impaneled . . . *unless it shall clearly appear from the whole proceedings that he has not been misled or prejudiced by the defect or variance in respect to which the amendment is made or that his rights will be fully protected by proceeding with the trial* or by a postponement thereof to a later day *with the same* or another *jury*.

Mich. Comp. Laws § 767.76 (emphases added). In particular, the Michigan Court of Appeals found that "even if defendant was only indicted on the first two counts, the court could have amended the indictment to conform with the evidence, [Mich. Comp. Laws §] 767.76, and defendant is unable to demonstrate prejudice because he received notice through the amended informations of the charges before trial." *McGhee*, 709 N.W.2d at 615. Regarding Petitioner's notice of the charges in the information prior to trial, the Michigan Court of Appeals made a factual finding that this Court must presume correct. *See* 28 U.S.C. § 2254(e); (Dkt. 14-6 at Pg ID 1000-01). Petitioner failed to produce evidence to rebut the presumption of correctness and the record supports the Michigan Court of Appeal's determination. The Michigan Court of Appeals apparently concluded that had trial counsel sought dismissal based on a void information, the dismissal would not have been granted because it would have "clearly appear[ed] from the whole proceedings that [Petitioner] ha[d] not been misled or prejudiced by the defect or variance in respect to which the amendment [would have been] made." *See* Mich. Comp. Laws § 767.76. Petitioner has not cited any authority establishing that the Michigan Court of Appeals reading and application of Mich. Comp. Laws § 767.76 is unreasonable. *See Hack v. Elo*, No. 98-CV-72915, 2000 WL 246596, at *5 (E.D. Mich. Feb. 11, 2000) ("A state court's construction of its own state's statutes is entitled to considerable

deference." (citing *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989))).  It follows then, that the

Michigan Court of Appeals did not unreasonably apply *Strickland* in concluding that counsel was

not ineffective for failing to seek dismissal pursuant to *People v. Glass*.

### 8.  The Cumulative Effect of Trial Counsel's Errors

Petitioner, without citing any case law in support, makes a cumulative error argument.

Petitioner states that "the evidence in the case was by no means overwhelming," and this deficiency

was compounded by

> a trial counsel who failed to object to the use of illegally seized
> evidence in the prosecution's case in chief, and who failed to move
> to exclude an inculpatory statement based on two [Fifth] Amendment
> grounds and failed to move to exclude all gun evidence thus allowing
> the defendant to be painted by the prosecution as a gun-toting drug
> dealer clever enough to avoid one conviction (based on the spurious
> statute of limitations issue and brought to the jury's attention by
> defense counsel).

(Am. Pet. for Habeas at 38.)

In *Mackey v. Russell*, a divided panel of the Sixth Circuit, in an unpublished decision, held:

> [T]he clear mandate of *Strickland* and several other Supreme Court
> cases is that the effect of all of counsel's errors is to be considered in
> toto, against the backdrop of the totality of the evidence in the
> case. . . .  In the instant case, the state appellate court, while finding
> several errors in [counsel's] actions, considered the prejudicial effect
> of each alone.  Since it did not consider the cumulative effect of these
> errors upon the jury's verdict, its decision was not merely in error,
> but was contrary to clearly established Supreme Court law. . . .  As
> a result, if the cumulative effect of these errors resulted in prejudice
> to [Petitioner], he is entitled to the writ, notwithstanding the decisions
> of the state courts in this case.

*Mackey v. Russell*, 148 F. App'x 355, 368-69 (6th Cir. 2005); *but see Middleton v. Roper*, 455 F.3d

838, 851 (8th Cir. 2006) ("We repeatedly have recognized 'a habeas petitioner cannot build a

showing of prejudice on a series of errors, none of which would by itself meet the prejudice test. . . .

We have no hesitancy in rejecting [Petitioner's] argument and concluding the cumulative effect of alleged trial counsel errors is not grounds for granting habeas relief."); *Stalnaker v. Bobby*, 589 F. Supp. 2d 905, 930 (N.D. Ohio 2008). Accordingly, the Court considers the cumulative prejudice of trial counsel's errors.

In performing an individualized analysis of Petitioner's ineffective assistance of counsel claims, this Court concluded that counsel arguably erred by (1) failing to argue that Petitioner had filed a lawsuit against Webb when seeking to admit evidence of Petitioner's civil suit; (2) failing to challenge the admission of firearm evidence from 1992, 1998, and 2001; and (3) failing to challenge two instances where the prosecution arguably vouched for Northern. The combined impact of counsel's errors may have increased the likelihood that the jury would conclude (1) that Petitioner was a "bad" person generally and a "drug dealer" specifically, and (2) that Petitioner knew about the drugs found in 1998 because he had possessed or distributed drugs in 1992 and 1995.

As explained in this Court's analysis of Claim VII, however, even if Webb had been impeached with evidence of his bias stemming from the civil suit, this impeachment would not have been particularly strong, would probably have opened the door to prior consistent statements, and would have corroborated Webb's testimony that Petitioner was present at a location where drugs were found. As for Northern, this Court has explained that the jury had good reasons to doubt his testimony and the two arguable instances of prosecutorial vouching that went unchallenged by counsel probably did little to quell that doubt. Moreover, Northern's testimony was cabined by the trial court's limiting instructions and counsel's arguments. Thus, absent the vouching for Northern and including the impeachment of Webb, the jury's view of the prejudicial character trait – drug dealer – and the relevant element of the charged crimes – knowledge of the drugs – would not have

significantly changed. Neither the vouching nor the impeachment would have significantly undermined the weight of those two witnesses' testimony. Finally, this Court has explained that while the gun evidence ran the risk of jurors assuming the Petitioner was violent, or had "bad" character generally, it did not increase the likelihood of the jury drawing the more prejudicial drug-dealer inference.

Thus, to the extent that a cumulative prejudice analysis is appropriate under *Strickland*, the Court finds that the combined prejudice does not demonstrate that there is a reasonable probability that, but for counsel's errors, the outcome of Petitioner's trial would have been different.

### G. Claims IA and IB: The Trial Court's Allegedly Erroneous Jury Instructions Do Not Justify Habeas Relief

Claims IA and IB assert that the trial court's failure to give certain jury instructions warrants habeas relief. In Claim IA, Petitioner asserts that the trial court erred in failing to give an instruction for a lesser-included offense: possession with intent to distribute 50 to 224 grams of cocaine. In Claim IB, Petitioner claims that the trial court erred by failing to instruct the jury that Northern was Petitioner's accomplice and, therefore, his testimony should have been viewed in that light. Neither claimed error supports a grant of habeas corpus.

Petitioner's claim that the jury should have been instructed on a lesser-included offense is not a cognizable basis for habeas relief. Although the Eighth Amendment requires that a trial court instruct the jury on lesser included offenses in the context of a capital case, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980), "the Constitution does not require a lesser-included offense instruction in non-capital cases," *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). In fact, even where a lesser offense instruction is requested, the failure to instruct on lesser included offenses in noncapital cases is not "such a fundamental defect as inherently results in a miscarriage of justice or an

omission inconsistent with the rudimentary demands of fair procedure." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990); *see also, Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Brewster v. Davis*, No. 06-10766, 2011 WL 1135755, at *6 (E.D. Mich. Mar. 28, 2011). "At a minimum, there is no clearly established Supreme Court precedent which requires a trial court to provide a requested lesser offense instruction in the non-capital context, as is required for habeas relief under § 2254(d)(1)." *Brewster*, 2011 WL 1135755, at *6.

Regrading the trial court's alleged error in failing to give an accomplice instruction for Northern's testimony, "[t]he Sixth Circuit has held, even on direct appeals from federal criminal trials, that a trial court's failure to give a special cautionary instruction on accomplice testimony is not reversible error, so long as the court has given the jury a general instruction on witness credibility and the various considerations that it should take into account in weighing the testimony of various witnesses." *Williams-El v. Bouchard*, No. 05-CV-70616, 2009 WL 3004008, at *10 (E.D. Mich. Sept. 15, 2009) (citing *United States v. Bucheit*, 134 F. App'x 842, 859 (6th Cir. 2005); *United States v. Allgood*, 45 F. App'x 407, 412 (6th Cir. 2002); *Scott v. Mitchell*, 209 F.3d 854, 883 (6th Cir. 2000); *United States v. Carr*, 5 F.3d 986, 992 (6th Cir. 1993)). Further, "federal habeas review of jury instruction claims arising out of a state court prosecution is even more deferential than direct review by a federal appellate court of a federal criminal conviction." *Id.*

In this case, the trial judge provided general instructions on witness credibility. For instance, he told the jurors to ask themselves "Does the witness have any bias, prejudice, or personal interest in how this case is decided? Have there been any promises, suggestions, or other influences that may have affected how the witness testified? In general, does the witness have any special reason to tell the truth, or any special reason to lie?" (Tr. III at 353.) And, as to Northern specifically, the

trial court provided: "You've heard testimony that a witness, Lamark Northern, made an agreement with the prosecution about charges against him in exchange for testimony in this trial. You've also heard evidence that Lamark Northern faced a possible penalty of twenty-two years as a result of those charges. You are to consider this evidence only as it relates to Larmark Northern's credibility and as it may tend to show Lamark Northern's bias or self-interest." (Tr. III at 355-56.)

Given the foregoing, the Court cannot conclude that the omission of an accomplice instruction deprived Petitioner of a fundamentally fair trial. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (providing that an erroneous jury instruction warrants habeas corpus relief only where the instruction "'so infected the entire trial that the resulting conviction violates due process.'" (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973))); *McGee v. Rapelje*, No. 08-11198, 2010 WL 5475813, at *10 (E.D. Mich. Dec. 30, 2010).

Accordingly, Claims IA and IB do not provide a basis for habeas relief.

### H. Claim VI: The Michigan Court of Appeals Did Not Unreasonably Conclude that the Evidence Against Petitioner Was Sufficient

In Claim VI, Petitioner challenges the sufficiency of the evidence presented against him at trial. In particular, Petitioner asserts that there was insufficient evidence to show that he had "dominion and control" of the narcotics found at 483 Montana. (Am. Pet. for Habeas at 68-71.) The Michigan Court of Appeals addressed this claim on the merits, *see McGhee*, 709 N.W.2d at 611-13; therefore Petitioner must carry a heavy burden to establish that habeas relief is warranted on this basis.

In particular, under AEDPA, challenges to the sufficiency of the evidence used to convict a petitioner must survive "two layers of deference to groups who might view facts differently than [the Court] would." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). First, as with sufficiency

71

of evidence claims brought on direct review, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Even if the Court would have voted not to convict a defendant had it participated in jury deliberations, it must uphold the verdict "if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Id.* Next, "even [if the Court] were to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [it] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* In short then, this Court must determine whether the state court's conclusion about rational jurors was rational.

As relevant here, each of the three charged offenses required the prosecution to show that Petitioner "knowingly possessed the [narcotics] with the intent to deliver." *People v. Wolfe*, 489 N.W.2d 748, 752 (Mich. 1992). "[P]ossession may be found even when the defendant is not the owner of recovered narcotics," and "possession may be joint, with more than one person actually or constructively possessing a controlled substance." *Id.* Moreover, "constructive possession may be demonstrated by direct or circumstantial evidence that . . . the defendant had the exclusive control or dominion over property on which narcotics are found." *Id.* at 754 (internal quotation marks and citations omitted).

Regarding his insufficiency of evidence claim, Petitioner asserts, "It seems undisputed that Petitioner did not have exclusive possession of the Montana property." (Am. Pet. for Habeas at 71.) More specifically, he provides:

> The house on Montana Street was a rental property. It had been rented out as recently as a few weeks before the police raid. That

tenant had allowed his recently paroled brother to stay at the house and that was the reason why Defendant asked the tenant to move out. The tenant had also allowed the defendant's father to enter the premises although this was against the wishes of the defendant. The key was not returned directly to the defendant but left at the house. The garage had a broken padlock and so was unsecured and the car inside the garage had a punched lock allowing access to the interior of the car. Petitioner was not the only person who had access to the home. His status as the landlord, should not be enough of a nexus since otherwise all landlords would be liable for what happens inside their rental properties.

(Am. Pet. for Habeas at 71.) While this summary of the evidence suggests that a rational juror might well have voted not to convict Petitioner, it does not present the evidence in the light most favorable to the prosecution, and, moreover, it does not preclude the possibility that a rational juror might reach the opposite conclusion.

As an initial matter, Petitioner has pointed to no evidence suggesting that the punched car lock allowed access to the interior of the vehicle and the Court's review of the trial transcript has uncovered no such testimony. And, under the controlling standard of review, a factual dispute must be resolved in favor of the prosecution. Regarding much of the other evidence mentioned by Petitioner, the Michigan Court of Appeals found:

The 1998 raid uncovered (1) an electric bill in defendant's name that covered the period from August 4, 1998, to September 2, 1998, and was due September 24, 1998, (2) an insurance document dated September 2, 1998, for a 1981 Pontiac in defendant's name and containing the address where the raid took place, (3) a vehicle title to a 1981 Pontiac in defendant's name and a 1996 registration for the same car in defendant's name and containing the same address as that of the raid that were found in the car located in the garage where the raid took place, (4) photographs of defendant, (5) an application for accidental death insurance for defendant dated August 17, 1998, and containing the address of the raid, and (6) a form from the Michigan Department of Consumer and Industry Services containing a note dated August 17, 1998, addressed to defendant's nickname, "Crunch." These documents, along with defendant's 1997 driver's

> license, which indicated the same address as that of the raid, and a
> warranty deed to defendant and [another] for the same premises,
> indicated defendant's ownership and control of the location at which
> the drugs were found at the time when they were found.

*McGhee*, 709 N.W.2d at 612. To this summary, this Court would add that a rational juror could

likely conclude that the Butler would not have left thousands-of-dollars in narcotics when moving

out. As to the possibility of another individual using the premises after Butler, Butler testified when

he moved out he locked the property. He also testified that he did not have access to the Grand Prix

while he lived there, the vehicle was locked when police arrived, and a large quantity of drugs were

found in the vehicle's back-seat console. Given the foregoing facts a rational jury could have found

that Petitioner "had the exclusive control or dominion over property on which narcotics are found,"

*Wolfe*, 489 N.W.2d at 754. At a minimum, it was not unreasonable for the Michigan Court of

Appeals to have reached that conclusion.

Habeas relief is therefore not warranted on Claim VI.

## I. Claim VIII: Petitioner's Fourth Amendment Claims Regarding the 1998 Search Warrant Are Not Cognizable on Habeas Review

Claim VIII is a Fourth Amendment claim. Petitioner asserts that the search warrant executed

on September 14, 1998 did not particularly describe the detached garage where drugs were found

and that the affidavit supporting that warrant did not establish probable cause. (Am. Pet. for Habeas

at 78-84.) These unconstitutional-search-and-seizure claims are not cognizable on a petition for

habeas corpus.

In *Stone v. Powell*, 428 U.S. 465, 494-95 (1976), the Supreme Court held that "where the

State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state

prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an

unconstitutional search or seizure was introduced at trial." Courts in the Sixth Circuit apply a two-step analysis to determine whether a petitioner was given a full and fair opportunity to litigate a Fourth Amendment claim in state court:

> First, the court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.

*Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted).

Petitioner raised the claim that the scope of the warrant did not include the garage at a suppression hearing. The trial court granted the motion and the prosecution appealed. Petitioner cross-appealed, asserting that the search-warrant affidavit was insufficient to establish probable cause of criminal activity. The Michigan Court of Appeals addressed these claims in a published opinion and found (1) that the search of the garage was not unconstitutional; (2) that the affidavit was not insufficient; and (3) that the search warrant was not "void on the basis of a lapse of time between the events alleged in the affidavit and the execution of the warrant." *People v. McGhee*, 662 N.W.2d 777, 782-84 (Mich. Ct. App. 2003). Petitioner filed an application for leave to appeal raising these issues in the Michigan Supreme Court. (Dkt. 14-29 at ECF Pg ID 3-23.) The Michigan Supreme Court denied leave. *People v. McGhee*, 469 Mich. 879, 668 N.W.2d 150 (Table) (Mich. 2003); *see also People v. McGhee*, 469 Mich. 879, 671 N.W.2d 880 (Table) (Mich. 2003).

Based upon the foregoing, Petitioner was provided an opportunity for full and fair litigation of his Fourth Amendment claim in the Michigan courts. Consequently, Claim VIII is simply not cognizable on habeas review.

## IV. RECOMMENDATION AND CONCLUSION

For the foregoing reasons, this Court RECOMMENDS that the Petition for a Writ of Habeas Corpus be DENIED.

## V. FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: April 17, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 17, 2012.

s/Jane Johnson
Deputy Clerk